722 A.2d 545 (1998)
317 N.J. Super. 392
COBRA PRODUCTS, INC., Plaintiff-Appellant,
v.
FEDERAL INSURANCE COMPANY d/b/a Chubb Group of Insurance Companies, Defendants-Respondents,
and
Deidre Burker, an individual, Defendant.
Superior Court of New Jersey, Appellate Division.
Argued December 9, 1998.
Decided December 31, 1998.
*546 Alexander W. Ross, Jr., Marlton, for plaintiff-appellant (Rakoski & Ross, attorneys; Mr. Ross, on the brief).
Michael J. Mernin, Parsippany, for defendants-respondents (Gennet, Kallman, Antin & Robinson, attorneys; Richard S. Nichols, on the brief).
Before Judges KING and WALLACE.
The opinion of the court was delivered by KING, P.J.A.D.

I
This matter arises from a property loss insurance dispute. The plaintiff Cobra Products, Inc. filed a complaint against defendant Federal Insurance Company seeking to recover the value of a property loss by theft. The defendant insurance carrier refused payment claiming the thefts constituted employee dishonesty and were excluded under the terms of the policy. Judge Mariano granted summary judgment in favor of defendant.
Plaintiff raises these issues on appeal:
I. The motion judge erred in granting summary judgment in favor of defendant because the disputed honesty exclusion is vague, ambiguous, and does not apply to non-employees or employees acting outside the scope of their employment.
II. The motion judge erred in denying plaintiff's motion to compel depositions and granting defendant's summary judgment motion before the plaintiff completed discovery.
III. The motion judge erred by denying plaintiff's request to orally argue its opposition to the motion for summary judgment.
We agree with the motion judge's ruling and affirm.

II
On May 20, 1996 plaintiff Cobra Products, Inc. (Cobra) filed a complaint against defendants Federal Insurance Company (FIC), doing business as Chubb Group of Insurance Companies (Chubb), and Deidre Burker *547 (Burker). The first count sought recovery of plaintiff's first-party insurance claim against defendant FIC for losses sustained during a series of thefts between October 1993 and March 21, 1994. The second count alleged bad faith against defendant FIC and demanded punitive damages. The third count alleged bad faith against defendant Burker, a claims representative employed by Chubb.
In April 1997 defendant FIC filed a motion for summary judgment returnable May 30, 1997. Prior to the return date defendant FIC agreed to withdraw its motion pending further discovery and in return, plaintiff agreed to dismiss its claims for attorney fees, extracontractual or bad-faith damages against FIC, and bad-faith damages against Burker, individually. Moreover, on May 21, 1997 defendant agreed to wait sixty to ninety days before reapplying for summary judgment to allow plaintiff to complete discovery, including the deposition of Burker. On May 30, 1997 the parties filed a stipulation of dismissal with prejudice as to counts II and III of the complaint and the claim for attorney's fees only. Plaintiff's counsel took Burker's deposition on June 25, 1997.
On September 12, 1997 defendant filed a second notice of motion for summary judgment. Plaintiff filed a notice of cross-motion to compel depositions on September 29, 1997. Both parties filed briefs and reply briefs in support of their motions. Both parties requested oral argument. R. 1:6-2(d).
The judge, for some unknown reason, denied the parties' requests for oral argument and decided the matter on the briefs. On October 10, 1997 Judge Mariano read into the record a two-page statement summarizing the undisputed facts, his finding that the dishonesty exclusion was "clear and unambiguous," and issued an order granting summary judgment in favor of defendant FIC.

III
Plaintiff Cobra is a New Jersey corporation with its principal place of business at 1064 Industrial Drive, Berlin Township, Camden County. Cobra manufactures sewer-cleaning equipment including manual and commercial-grade power-driven models of drain-cleaning machines called "plumbing snakes" which are sold under the names of "Qwikie Electric," "Mighty Qwik," and "Mighty Rooter." Cobra also owns a factory and warehouse in Willingboro where it manufactures and stores the sewer-cleaning equipment.
As of October 1, 1989 FIC insured the plaintiff under a commercial property insurance policy, number XXXX-XX-XX. FIC renewed Cobra's commercial insurance coverage policy annually through October 1, 1994. The policy provided that FIC agreed to pay for "direct physical loss or damage to each Subject of Insurance except as stated in Limitations or Exclusions." Subjects of insurance included "personal property," which the policy defined as
all your business personal property and business personal property in which you have an insurable interest, but not your building, on the premises stated in the Declarations or within 1,000 feet.
The policy contained exclusions for "dishonesty" and "disappearance." The "dishonesty" exclusion applied to losses from
fraudulent, dishonest or criminal acts or omission committed by you or your employees or by anyone authorized to act for you.
The "disappearance" exclusion referred to losses from "mysterious disappearance or inventory shortage."
Between October 1993 and March 1994 Cobra had an unexplained loss of inventory at its facility in Willingboro, particularly motorized sewer-cleaning equipment. On March 9, 1994 one of its employees observed another employee, Michael Bell, leave the plant with two sewer-cleaning machines. Cobra notified the police on March 21, 1994 about Bell and these thefts. Officer Conrad went to Cobra on that same day to investigate and spoke with John Simmons, plant manager. Simmons stated that Cobra had fired Bell on March 15, 1994 after he had argued with and cursed out a supervisor. When Bell returned to Cobra on March 17, 1994 to get his final paycheck, he confessed to company president Nick Moss that he had taken two machines, valued at about $222 each, and said other individuals were involved. *548 Bell named Raphael Batista, Vivian Torres, Wayne "Al" Greenwood and Claribel Arocho as involved in the thefts. Cobra rehired Bell after he agreed to help in the theft investigation.
On March 26, 1994 Bell gave a voluntary statement to Detective Felice after advised of his constitutional rights. Bell told the detective he had been employed by Cobra for about six months. Bell said he worked the night shift from 3:30 p.m. until midnight, and "was head of the department of blue wire, heavy wire and also ran a forklift." In his statement, Bell implicated his brother George Veldas in the thefts. Bell again mentioned Greenwood, Batista, Arocho, and Torres. He identified Batista as a Cobra employee, and Veldas and Greenwood as former employees. Cobra never brought charges against Bell and did not make him pay restitution. The record includes arrest reports for Batista, dated March 31, 1994, and Arocho, dated March 23, 1994. In his deposition, Moss stated police also arrested Torres. The record is silent on whether the police arrested Greenwood and Veldas.
Cobra retained the accounting firm of Abo, Uris and Altenberger (Abo) to determine the total loss. In a report of October 28, 1994 Abo asserted Cobra sustained a loss of $73,434 as a result of the thefts. Specifically, the accountants determined the thefts involved 215 Qwikie Electric machines, 189 Mighty Rooter machines, and 75 Mighty Qwik machines.
Cobra then filed a claim with FIC claiming the stolen drain-cleaning machines constituted "finished stock personal property" under the terms of the commercial property insurance policy. Cobra supplied FIC with details of the loss on November 22, 1994.
On January 3, 1995 adjuster Patricia Healy sent an e-mail message to FIC's primary adjuster Deidre Burker informing her that there were "a lot of questions" regarding the Cobra claim. Healy advised Burker that "[i]f employee employeed [sic] at the time of the theft may preclude coverage."
As part of its investigation, FIC examined Moss under oath. Moss said an employee Susan Stanhope first reported Bell had stolen the machines. Moss then confronted Bell, whom he described as a materials handler, responsible for "moving goods within the building and getting parts necessary for all departments." Bell usually used "a tow motor, fork truck."
Bell confessed to stealing the inventory with the complicity of other Cobra employees. He explained that he took the finished goods, put them into large cardboard boxes or "gaylord" containers, threw trash on top of them, took them outside and left them in the company's parking lot behind a dumpster. At the end of the second work shift,
when employees would be either in their own cars or they had transportation picking them up, friends or family members picking them up, they would then go and get the units from the trash area and load them in the truck and now take them off the premises.
Moss stated that no one ever saw any signs of forced entry into the warehouse. He also reported from memory his recollection of statements by Torres and Arocho that they gave money to Bell during work hours and told him how many machines they wanted him to steal. Moss said:
Basically the comment was they put their order in during the day or during the shift with Mike Bell, Mike Bell got the units outside and at the end of the shift Mike Bell put theseand they were caught with two units in the back of their car and they drove them off and that's when the police caught them off the property on the public street with two of the Mighty Rooter units. Just that, one night, it was a thousand dollars worth of goods out the door, $500 or so worth of goods out the door one night one group of people.
Moss confirmed that Cobra hired Greenwood as a spring-coiling machine operator, and both Batista and Arocho as assemblers or packagers. Greenwood left Cobra on February 24, 1994; Veldas was terminated on January 27, 1994. Cobra fired Batista, Arocho, and Torres on or near the date of their arrests in March 1994.
On April 18, 1996 FIC informed Cobra of its decision to deny the claim. FIC relied on the policy's "dishonesty" provision, which excluded *549 insurance coverage for any fraudulent, dishonest or criminal acts committed by an employee of the insured.
On May 20, 1996 Cobra filed a complaint in the Superior Court, Law Division, Camden County. As noted, after discovery, defendant FIC prevailed on summary judgment granted by Judge Mariano. He stated in his opinion:
The opposition to this motion seems to be basically that the exclusion clause it referred to is ambiguous. And, that the theft didn't take place and that co-employeeI'm sorry, non-employees were involved in the theft because on occasions these non-employees would come and remove the materials from the dumpster placed there by Mr. Bell. The argument is facetious. The clause the Court finds to be clear and unambiguous. Clearly it is the plaintiff's employee, Michael Bell, who is acting during the course of his employment to deprive the plaintiff of the possession, use and control of the stolen items.
He's the one that removed them from the building and put them into the dumpster and did it surreptitiously. The fact that a non-employee is involved in this theft or dishonest act or criminal act, at a later stage, is no defense to this motion.

IV
A moving party is entitled to summary judgment if there is no genuine issue as to any material fact in the record. R. 4:46-2. In deciding a summary judgment motion, a court must apply the standard articulated in Brill v. Guardian Life Ins. Co. of America, 142 N.J. 520, 666 A.2d 146 (1995):
a determination whether there exists a "genuine issue" of material fact that precludes summary judgment requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.

[142 N.J. at 540, 666 A.2d 146.]
The first issue is whether the dishonesty exclusion clause in FIC's commercial property insurance policy was sufficiently clear and unambiguous to relieve FIC of liability for Cobra's loss. Cobra argues its loss is compensable because the exclusion is "vague and subject to different interpretations."
Under well-settled principles, the interpretation of insurance contracts requires generous readings of coverage provisions, narrow readings of exclusionary provisions, resolution of ambiguities in favor of the insured, and construction consistent with the insured's reasonable expectations. Search EDP, Inc. v. American Home Assurance Co., 267 N.J.Super. 537, 542, 632 A.2d 286 (App. Div.1993), certif. denied, 135 N.J. 466, 640 A.2d 848 (1994). But a clear and unambiguous insurance policy must be enforced as written. Universal Underwriters Ins. Co. v. New Jersey Mfrs. Ins. Co., 299 N.J.Super. 307, 312, 690 A.2d 1104 (App.Div.1997). However, any ambiguity found in the policy must be construed against the insurer and an exclusion clause must be "strictly construed against the insurer." Stafford v. T.H.E. Ins. Co., 309 N.J.Super. 97, 103, 706 A.2d 785 (App.Div.1998). While a court should not ignore an exclusion's clear meaning, if there is another fair interpretation, the court must construe the insurance policy in favor of coverage and against the insurer, adopting the interpretation supporting coverage. Id. at 105, 706 A.2d 785. However, "[t]his does not mean ... that any far-fetched interpretation of a policy will be sufficient to create an ambiguity requiring coverage." Id.
Generally, an insured bears the burden of establishing that a claim is within the basic policy terms. Diamond Shamrock Chemicals v. Aetna, 258 N.J.Super. 167, 216, 609 A.2d 440 (App.Div.1992), certif. denied, 134 N.J. 481, 634 A.2d 528 (1993). The insurer has the burden of establishing application of an exclusion. Hartford Acc. & Indem. Co. v. Aetna Life & Cas. Ins. Co., 98 N.J. 18, 26, 483 A.2d 402 (1984).
Here, FIC's disclaimer is based on the language of the dishonesty exclusion. The exclusion provides that the policy does not provide coverage to any claim arising out of *550 fraudulent, dishonest or criminal acts or omission committed by you or your employees or by anyone authorized to act for you.
Cobra contends the exclusion clause is "overbroad and vague" because it refers to any type of "dishonesty." Cobra also argues the exclusion does not expressly prohibit a claim for "employee theft" or "theft by employees." Cobra claims "[a] plain reading of the exclusion's wording [lends] itself to an interpretation which bars `fraudulent, dishonest or criminal acts ... committed by you' [the employer] or by `anyone authorized to act' for the company." Thus, its purpose "is to [prevent] fraudulent acts by the company, acting in concert with its employees, meant to falsely or fraudulently obtain insurance monies from the appellee."
For example, Cobra asserts in its brief:
this would include a scheme by the company to sell a container labeled as 100 units, when in fact, in a conspiracy with its employees, the container holds only 90 units, and then place a false insurance claim for the "missing" ten units. Such an interpretation is reasonable as it can be extracted from the way the provision is worded: "... by you [i.e., the company] or your employees or anyone authorized to act for you" (emphasis added). Literally, the exclusion addresses and encompasses the employer/appellant itself (there are two references to the appellant; "you," or "anyone authorized to act for you"), which leads to a reasonable interpretation that the primary thrust is to exclude theft by the appellant or by employees on behalf of the appellant. An analogous example in the life insurance industry would be the exclusion of a beneficiary who murders the insured. The reason for this is obvious: the defendant justifiably wishes to prevent fraudulent claims.
Because the exclusion clause is subject to these allegedly disparate interpretations, Cobra contends we must resolve the question in its favor under accepted principles of insurance law.
Cobra's argument fails on several grounds. First, Cobra does not accurately describe the language of the exclusion. Specifically, the exclusion does not only refer to fraudulent, dishonest or criminal acts by the insured or its authorized representatives as Cobra urges in its brief. Rather, the exclusion also explicitly includes such acts committed by the insured's "employees."
Second, the purpose of the dishonesty exclusion was not solely to protect the insurer against attempts by Cobra and its employees to obtain insurance proceeds improperly. Rather, the purpose of the exclusion was to avoid the liability of the insurer for any "dishonest" acts by the insured or its employees or authorized representatives. To protect against such dishonesty losses, the insured could have elected to buy a fidelity or suretyship bond. Fidelity bonds insure the employer for dishonest or fraudulent acts of employees. Nat'l Newark & Essex Bank v. American Ins. Co., 76 N.J. 64, 75-76, 385 A.2d 1216 (1978); see generally, 9A Appleman, Insurance Law and Practice, § 5661-78 at 294-374 (1981). To qualify the loss for this type of coverage, the employee must commit the act with the intent to cause loss to the insured and benefit the employee or another person. North Jersey Savings & Loan Assoc. v. Fidelity & Deposit Co. of Maryland, 283 N.J.Super. 56, 66, 660 A.2d 1287 (Law Div.1993). Where an employee knowingly assists another to commit or conceal an act of fraud or dishonesty, this also may qualify the loss for coverage under the fidelity bond. See 9A Appleman, Insurance Law and Practice, § 5668 at 331-32 (1981). Our Supreme Court has broadly interpreted the terms "fraudulent" and "dishonest" in the context of fidelity bonds to "evidence the clear intent to protect the employer against employees' wrongful acts which, though not criminal, nevertheless display a significant lack of probity, integrity or trustworthiness." Nat'l Newark & Essex Bank, 76 N.J. at 75-76, 385 A.2d 1216 (quoting Mortgage Corp. of New Jersey v. Aetna Cas. & Sur. Co., 19 N.J. 30, 36, 115 A.2d 43 (1955)).
In Hayman v. Acme Carriers, 303 N.J.Super. 355, 696 A.2d 1125 (App.Div.1997), this court addressed a similar issue involving an exclusion in an insurance policy for employee theft. In Hayman an employee of Acme stole 200 cases of shrimp while transporting *551 the load to the plaintiff's warehouse. Id. at 356-57, 696 A.2d 1125. Chubb & Sons had issued a motor truck cargo liability policy covering the shipment. Id. at 357, 696 A.2d 1125. The policy excluded coverage
for loss or damage caused by or resulting from (a) any fraudulent, dishonest or criminal act(s) committed alone or in collusion with others by: (1) the insured or any employee
... or any other authorized representative of the insured, whether or not such act(s) be committed during regular business hours.

[Id.]
We concluded it inconsistent with the reasonable expectations of the parties to provide coverage because there was no ambiguity in this commercial policy and the employee had pled guilty to the theft charge. We did recognize there might be cases when a carrier must pay when the exclusion may give rise to an ambiguity such as "who must commit the crime, or where the alleged facts may or may not be criminal." Id. at 361, 696 A.2d 1125.
In the present case, the dishonesty exclusion is clear and unambiguous. Cobra's commercial loss policy expressly excluded losses from "fraudulent, dishonest or criminal acts ... committed by you or your employee or by anyone authorized to act for you." As did the employee in Hayman, Bell admitted the thefts he committed while employed. He and his co-conspirators stole and resold for $225 each about 479 sewer-cleaning machines valued at $73,434 from Cobra over a period of about six months.
Because employee Bell committed these thefts in conjunction with others, with the intent to create a financial gain for himself and a loss to Cobra, the loss would have been covered under a fidelity bond. However, absent such a bond, the dishonesty exclusion in this property loss policy operates to limit the liability of the insurer FIC and creates a gap in the coverage.

V
Next, Cobra argues that even if the exclusion covered employee theft, Bell did not act within the scope of his employment when he took the machines from Cobra's factory and placed them near the dumpster in the company's parking lot. Cobra also asserts that only non-employees or former employees actually removed the items from the insured's premises.
Cobra relies on Del Vecchio v. Old Reliable Fire Ins. Co., 132 N.J.Super. 589, 334 A.2d 394 (Law Div.1975), to support its claim that Bell was not an "employee" when he took the machines from Cobra's factory. In Del Vecchio, an off-duty employee forcibly entered his employer's warehouse on a Sunday to commit a theft. Id. at 590-91, 334 A.2d 394. The insurance policy covered the risk of theft but excluded "conversion, sabotage or other act of dishonest character on the part of the insured or his or their employees and/or agents." Id. at 591, 334 A.2d 394. The Law Division judge there held that if the employee had tried to appropriate the stolen chattels during normal work hours, his dishonest act would have been excluded from coverage. Id. at 595, 334 A.2d 394. However, the judge found the clause was not clearly applicable to times other than the normal work day and resolved this purported ambiguity in favor of the insured. Id. at 596, 334 A.2d 394.
In the case before us, there is no dispute that Cobra employed Bell as a materials handler at the time of the thefts. Unlike Del Vecchio, Bell was on duty when the thefts occurred. Bell took sewer-cleaning machines in a "gaylord" container and removed them from Cobra's building. Bell committed these acts during his working hours. Even though Bell did not actually take the machines away from the insured's premises or beyond 1000 feet of the insured's building (the area covered in the policy), he did play the key role in the theft operation. His employee status enabled him to gain access to the machines and conceal them behind the dumpster in the company's parking lot. Bell committed "fraudulent, dishonest or criminal acts" as Cobra's employee which fell within the terms of the exclusion, even though his actions were outside the scope of his employment.
Cobra also claims the exclusion did not apply because non-employees or former employees committed the thefts. All five of *552 Bell's co-conspirators apparently worked for Cobra when the thefts began. Batista, Torres and Arocho continued as employees until their arrests, according to Moss. Veldas left Cobra on January 27, 1994 and Greenwood left on February 24, 1994. Moss did not know whether Veldas or Greenwood were fired or quit.
Cobra contends these individuals were not functional employees because the thefts occurred at the end of their shifts when they were off-duty. Unlike Del Vecchio, these employees did not return to the warehouse during "off-hours" and did not forcibly enter the premises. Rather, Moss testified that
[a]t the close of the end of the shift when employees would be either in their own cars or they had transportation picking them up, friends or family members picking them up, they would then go and get the units from the trash area and load them in the truck and now take them off the premises.
Del Vecchio, is not controlling on us and to the extent it is inconsistent with this opinion, we reject it. Also, Del Vecchio is quite distinguishable on its facts. Batista, Greenwood, Torres, Arocho and Veldas were employees during the times when they left the job site at the end of their shifts and took the stolen machines with them. There is no indication in the record that anyone returned to the factory, after hours or on weekends, to steal the machines. After Greenwood and Veldas left Cobra, the record does not reveal if they continued to participate in the theft operation. Whether or not Bell's co-conspirators were actual Cobra employees at the time of the thefts is not legally significant, however. Bell clearly was an employee at all times. He initiated the thefts and his dishonesty defeats the coverage. As Judge Mariano properly observed:
Clearly, it is the plaintiff's employee, Michael Bell, who is acting during the course of his employment to deprive the plaintiff of the possession, use and control of the stolen items.
He's the one that removed them from the building and put them into the dumpster and did it surreptitiously. The fact that a non-employee is involved in this theft or dishonest act or criminal act, at a later state, is no defense to this motion.
The remaining contentions are without merit. R. 2:11-3(e)(1)(E). Plaintiff has had oral argument on this appeal. All material facts are available to us and further discovery was not needed.
Affirmed.