893 A.2d 53 (2006)
383 N.J. Super. 650
Chase SHALER, a minor, by and through his Guardian ad Litem, Melissa SHALER, and Melissa Shaler, Individually, Plaintiffs-Respondents,
v.
TOMS RIVER OBSTETRICS & GY-NECOLOGY ASSOCIATES; and Joseph Cudia, M.D., Defendants, and
New Jersey Property-Liability Insurance Guaranty Association, Defendant/Intervenor-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued February 16, 2006.
Decided March 10, 2006.
Mark M. Tallmadge, New York, NY, argued the cause for defendant/intervenor-appellant (Bressler, Amery & Ross, attorneys; Mr. Tallmadge and Richard J. Teer, on the brief).
*54 Michael L. Weiss, Northfield, argued the cause for respondent (The Weiss Law Firm, attorneys; Mr. Weiss, on the brief).
Before Judges WEFING, WECKER and FUENTES.
The opinion of the court was delivered by
FUENTES, J.A.D.
This appeal requires us to address a narrow issue of insurance law: Whether the New Jersey Property Liability Insurance Guaranty Association ("PLIGA") is obligated to pay excess coverage under a policy of insurance issued by a now insolvent carrier, when the primary coverage limits have not been paid by reason of insolvency of the primary insurer, and the excess policy provides that if the insurer issuing the primary coverage is unable to pay by reason of insolvency, the excess coverage would be collectible "only after the amounts set forth in the limits of the underlying [primary] coverage have been paid."
The question arises in the context of a settlement reached by plaintiffs and defendants, and approved of by PLIGA, where: (1) the insolvent carrier issued both the primary policy and the excess policy; (2) the coverage limit under the primary policy was one million dollars; (3) PLIGA paid its statutory maximum of $300,000 under the primary policy; and (4) the insured-tortfeasor was explicitly released from any personal liability arising out of the underlying cause of action.
We hold that, under these circumstances, PLIGA is not obligated to pay the statutory maximum, because the claim asserted does not fall within the meaning of a "covered claim" under the excess policy. Our conclusion is informed by our recent decision in Johnson v. Braddy, 376 N.J.Super. 215, 219-20, 869 A.2d 964 (App. Div.2005), aff'd, 186 N.J. 40, 890 A.2d 944 (2006), wherein we held that "if a plaintiff's damages exceed the tortfeasor's insurance coverage, the tortfeasor remains personally liable for the excess."
Here, but for the settlement agreement, the tortfeasor would have remained personally liable to pay the difference between PLIGA's statutory maximum of $300,000, and any award up to the one million dollars coverage limit of the primary policy. The personal liability protection provided to the tortfeasor in the settlement agreement prevents us from ascertaining whether he (the tortfeasor) is able to meet this financial obligation. Thus, without more, we are compelled to enforce the clear, unambiguous "coverage-trigger"[1] in the excess policy, requiring that the full amount of primary coverage be paid, before any obligation under the excess policy can arise. Because the trial court held otherwise, we reverse.
The legal issues discussed here came before the Law Division by way of cross-motions for summary judgment. We will thus recite the salient facts of the case based on the limited factual record developed before the trial court.

I
Plaintiff, Chase Shaler ("Chase"), is a minor. He brought this legal action by and through his Guardian Ad Litem, Melissa Shaler ("Shaler"), who also asserted an individual claim. The suit alleged medical malpractice against defendants Toms *55 River Obstetrics & Gynecology Associates ("Toms River"), Dr. Joseph Cudia ("Cudia"), and Community Medical Center (the "Center"). Under plaintiffs' theory of liability, Cudia, an obstetrician employed by Toms River, deviated from the standard of care expected of a physician of his specialty and training, by committing obstetrical negligence during the delivery of Chase. Specifically, plaintiffs allege that Chase sustained severe brain injury, manifested by cerebral palsy, progressive microcephaly, and subarachnoid hemorrhaging, resulting in significant developmental delays.
Plaintiffs' cause of action implicated three separate liability insurance policies. Cudia had both a primary and an excess liability policy covering him individually. Toms River had a group policy that provided coverage to the practice. Cudia's primary policy had a limit of $1,000,000 per incident and $3,000,000 aggregate. His excess policy had liability limits of $2,000,000 per incident and $2,000,000 aggregate. Toms River's primary policy had liability limits of $3,000,000 per incident and $5,000,000 aggregate. All three policies were issued by PHICO Insurance Company ("PHICO").
On February 1, 2002, the Commonwealth of Pennsylvania declared PHICO insolvent and ordered it into liquidation. As a result, PLIGA assumed responsibility for the defense of this action. N.J.S.A. 17:30A-8a(1). In this light, plaintiffs asserted a claim against PLIGA for the maximum statutory benefit of $300,000 for a covered claim under each of the three policies ($900,000). Ibid. At the onset of the litigation, PLIGA conceded that plaintiff was entitled to $300,000 under Cudia's primary policy, but disputed whether there was a covered claim under the group policy issued to Toms River and the excess policy covering Cudia.
PLIGA argued that since the primary policy provided a liability cap of $1,000,000, after the deduction of the $300,000, there still remained a $700,000 liability gap in coverage under the primary policy that remained unpaid. Thus, plaintiffs were precluded from collecting the statutory benefits under the excess policy, because the policy required that the underlying limits be paid before any obligation to pay under the excess policy attached.
The excess policy issued by PHICO to Cudia requires that the insured maintain collectible primary insurance. It is not disputed that under a section labeled "Maintenance of Underlying Coverage," the excess policy expressly conditions the extension of excess coverage upon the actual payment of the primary policy's coverage limits. The provision reads as follows:
It is a condition of this insurance that while it is in effect, the insured shall maintain in force as collectible insurance the underlying coverage shown in the Schedule of Underlying Coverage without reduction in limits (except for any reduction or exhaustion of any applicable aggregate limit contained therein as described under III, Limits of Liability, below) or alteration of terms and conditions. In the event the insured fails to maintain such scheduled underlying coverage as required or fails to comply with any condition of the underlying coverage subsequent to loss under such coverage and such failure in itself results in failure of the insured to recover under such underlying coverage, or in the event of the inability of the underlying coverage provider to pay by reason of bankruptcy or insolvency, this insurance shall apply as though such underlying coverage was in force and collectible, but only after the amounts set forth in the limits of underlying coverage have been paid. If limits of insurance available under the scheduled underlying coverage or coverages *56 are increased, this insurance shall apply as excess of such increased limits.[2]
[Fourth emphasis added.]
On or about August 3, 2004, the parties entered into a stipulation of settlement, through which plaintiffs agreed to accept that PLIGA would pay "whatever sum is judicially determined to be the maximum that the plaintiffs could have possibly recovered from the Fund in the event of a successful jury verdict in this matter against Dr. Cudia and Toms River OB/GYN Associates (on a respondeat superior theory based on Dr. Cudia's conduct)." (Emphasis added.) In exchange, plaintiffs agreed to release Cudia and Toms River from any further liability, and expressly abandoned the right to seek any financial contribution from them toward the settlement. PLIGA agreed to pay $300,000 pursuant to the primary policy. The parties further stipulated to submit to the court, on motion for summary judgment, the issue of whether plaintiffs had a "covered claim" under the excess policy or the Toms River policy.
On the return date of the cross-motions for summary judgment, PLIGA reiterated its position that, under the terms of the excess policy, plaintiffs had not presented a "covered claim." Plaintiffs argued that PLIGA was obligated to extend coverage under the excess policy, because PHICO's insolvency made the provision requiring actual payment of the limits of the primary policy a nullity. Plaintiffs also maintained that it would be against public policy to permit an excess insurer to eliminate liability simply because the primary insurer becomes insolvent.
The trial court issued a memorandum of decision rejecting PLIGA's argument, and determining that plaintiffs had presented covered claims under all three policies. Thus, based on the terms of the settlement agreement, PLIGA was obligated to pay plaintiffs a total of $900,000, or $300,000 for each claim. According to the trial court, PLIGA's position would subvert the intent and purpose expressed in the Act, because it would render the excess policy coverage unavailable when the primary insurer is insolvent, "unless the insured voluntarily pays a sum of money equal to the limitations found in the excess policy." (Emphasis added).[3]

II

A

Standard of Review
We begin our analysis of the legal issues by reaffirming a rudimentary principle of appellate review. In reviewing a matter on summary judgment, we will apply the same standards applicable in the trial court. Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 536-37, 666 A.2d 146 (1995); Prudential Property & Cas. Ins. Co. v. Boylan, 307 N.J.Super. 162, 167, 704 A.2d 597 (App.Div.) certif. denied, 154 N.J. 608, 713 A.2d 499 (1998); R. 4:46-2(c). Here, because the judgment presented for our review involved purely legal determinations, *57 we owe no special deference to the trial court's analysis and ultimate legal conclusions. State v. Harris, 181 N.J. 391, 419, 859 A.2d 364 (2004), cert. denied, ___ U.S. ___, 125 S.Ct. 2973, 162 L.Ed.2d 898 (2005).

B

PLIGA's STATUTORY MISSION
In adopting N.J.S.A. 17:30A-1 to -20, known as the New Jersey Property-Liability Insurance Guaranty Association Act (the "Act"), the Legislature created a non-profit association that provides limited benefits and protection to both insureds and claimants when a licensed insurance company becomes insolvent. N.J.S.A. 17:30A-1, 17:30A-6: ARCNET Architects, Inc. v. N.J. Prop.-Liab. Ins. Guar. Ass'n, 377 N.J.Super. 102, 105, 871 A.2d 728 (App.Div.2005). The purpose of the Act is to "provide a mechanism for the payment of covered claims under certain insurance policies, to avoid excessive delay [of] payment, to minimize financial loss to claimants or policyholders because of the insolvency of an insurer...." N.J.S.A. 17:30A-2a (emphasis added); Carpenter Tech. Corp. v. Admiral Ins. Co., 172 N.J. 504, 515, 800 A.2d 54 (2002).
The Legislature expressly indicated that "[t]his act shall be liberally construed to effect the purpose under section 2 which shall constitute an aid and guide to interpretation." N.J.S.A. 17:30A-4(a)(footnote omitted). "PLIGA manages and administers claims against an insolvent insurer" and is "obligated to the extent of the covered claims against an insolvent insurer incurred prior to or 90 days after the determination of insolvency...." ARCNET Architects, Inc., supra, 377 N.J.Super. at 105, 871 A.2d 728 (quoting N.J.S.A. 17:30A-8a(1)).
PLIGA is "deemed the insurer to the extent of its obligations on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent." Id. at 105-06, 871 A.2d 728 (quoting N.J.S.A. 17:30A-8a(2)). Its obligation is limited to the payment of covered claims, and it is not "a panacea for all problems caused by insurance company insolvencies." Carpenter Tech. Corp., supra, 172 N.J. at 524, 800 A.2d 54. It was not designed "as a form of reinsurance for every insurer who becomes insolvent." Id. at 524-25, 800 A.2d 54 (quoting Palmer v. Montana Ins. Guar. Ass'n, 239 Mont. 78, 82, 779 P.2d 61 (1989)).
The Act defines "covered claim" as "an unpaid claim ... which arises out of and is within the coverage, and not in excess of the applicable limits of an insurance policy to which this act applies, issued by an insurer, if such insurer becomes an insolvent insurer" and if the claimant is a New Jersey resident or raises property damage claims regarding property permanently located in New Jersey. N.J.S.A. 17:30A-5.
PLIGA's obligation is limited to "that amount of each covered claim which is less than $300,000.00 per claimant" or the limits set by the policy. N.J.S.A. 17:30A-8a(1). Its obligation to defend an insured "cease[s] upon the association's payment or tender of an amount equal to the lesser of the association's covered claim statutory limit or the applicable policy limit." N.J.S.A. 17:30A-8a(1).

C

COVERED CLAIMS UNDER THE EXCESS POLICY
We begin our examination of PLIGA's liability for excess coverage by looking at the relevant provision of the PHICO policy purchased by Cudia. As noted earlier, the *58 policy expressly conditions the extension of excess coverage upon the insured (Cudia) maintaining primary coverage in the amount of one million dollars. The policy also sets out the coverage obligations in the event the primary carrier becomes insolvent.
[I]n the event of the inability of the underlying coverage provider to pay by reason of bankruptcy or insolvency, this insurance shall apply as though such underlying coverage was in force and collectible, but only after the amounts set forth in the limits of underlying coverage have been paid.

[Emphasis added.]
Here, after PHICO's insolvency, PLIGA assumed its statutory obligation under the primary policy, and paid the statutory maximum coverage of $300,000. This created a $700,000 coverage-gap in the primary policy, i.e., the difference between the policy's $1 million coverage, and PLIGA's payment of its statutory maximum. Under the clear, unambiguous terms of the excess coverage provision, PLIGA, as the successor of PHICO's excess policy, is statutorily entitled to assert the defense contained in the "coverage-trigger," because "the amounts set forth in the limits of underlying coverage have [not] been paid." N.J.S.A. 17:30A-8a(2).
Plaintiffs argue that, as a matter of public policy, we should reject an interpretation of the excess coverage provision that, under different facts, permits a financially healthy insurer to escape from its coverage obligation, while PLIGA, a public entity established to serve as the fund of last resort, remains liable.[4] The scenario contemplated by plaintiffs involves an insolvent primary insurer, and a solvent excess carrier, providing the same coverage offered by PHICO here. Under these proposed facts, PLIGA would be substituted for the insolvent insurer, and hence assume responsibility, up to its statutory maximum, for the primary carrier's obligation. The solvent excess carrier would not have any coverage responsibility, because the balance of the primary coverage had not been paid.
On their face, these hypothetical facts do present a disconcerting incongruity. PLIGA, the entity created by the Legislature to manage the public fund of last resort, would be legally compelled to pay. By contrast, the for-profit insurance company would be able to walk away, without incurring any obligation. To compound the problem, the two innocent parties in this scenario: plaintiff, as the victim of the tort; and defendant, as the individual who dutifully paid his/her insurance premium to avoid this precise financial risk, are left to carry the burden.
In cases such as this one, where the injuries to the minor plaintiff are permanent and catastrophic, PLIGA's statutory maximum coverage of $300,000 is grossly inadequate to provide meaningful, long-term care for this injured child. Practically, these funds will be significantly consumed by the legal expenses incurred in the prosecution of the claim. Conversely, from the tortfeasor's perspective, the very real prospect of financial ruination flowing from a single, although albeit, serious professional misjudgment, can be disastrous, and perhaps even deter others similarly *59 situated from pursuing a professional calling that carries this type of risk.
Thus, plaintiffs argue, sound public policy demands that we construe the so-called "payment in full" trigger of coverage in the excess policy satisfied, when PLIGA pays its statutory maximum obligation under the primary policy. We are not wholly unsympathetic to plaintiffs' argument. We cannot overlook, however, that plaintiffs negotiated and agreed to a settlement agreement that intentionally excluded from the discussion the tortfeasor's ability to personally compensate plaintiffs for any monetary damages beyond PLIGA's statutory maximum.
The reasons for plaintiffs' decision to structure the settlement agreement in this fashion are not disclosed in the record. During oral argument before this court, counsel for plaintiffs indicated that his decision to exempt Cudia from contributing to his clients' recovery, was guided by his own research on the matter. We note that at the time the settlement agreement was struck, there was only one reported decision on the question of personal liability of the tortfeasor beyond the amount covered by PLIGA. In Flaherty v. Safran, 367 N.J.Super. 565, 571, 843 A.2d 1198 (Law Div.2003), overruled by Johnson, supra, 376 N.J.Super. at 223, 869 A.2d 964, the court held that a defendant tortfeasor is not personally responsible for the amount in excess of PLIGA's statutory maximum, but less than the policy limits originally issued by the insolvent carrier.
Flaherty was expressly overruled by Johnson, supra, 376 N.J.Super. at 223, 869 A.2d 964. Writing for the panel in Johnson, Judge Skillman emphasized that:
The basic policy of our law is to allow an injured party to recover the full amount of his or her damages from the tortfeasor. Thus, if a plaintiff's damages exceed the tortfeasor's insurance coverage, the tortfeasor remains personally liable for the excess. Moreover, in furtherance of this policy, statutes mandating insurance coverage are liberally construed to provide the broadest possible protection to injured parties.
In view of our State's strong public policy of affording injured parties an opportunity to recover the full amount of their damages, we believe that if the Legislature had intended to immunize tortfeasors from liability for damages in excess of [PILGA's] $300,000 maximum liability, it would have included a provision in the Guaranty Act expressly stating this intent. The general statement of a legislative purpose "to minimize financial loss to claimants or policyholders because of the insolvency of an insurer," N.J.S.A. 17:30A-2(a), cannot reasonably be construed as an expression of legislative intent to favor policyholders over claimants by immunizing policyholders from liability for damages in excess of [PLIGA's] $300,000 maximum liability. Where either an innocent injured party or a tortfeasor must bear the adverse financial consequences of the insolvency of the tortfeasor's insurer and the $300,000 limit on [PLIGA's] liability, it is more reasonable to infer a legislative intent to favor the injured party. This conclusion is reinforced by the fact that, without enactment of the Guaranty Act, the holder of an insurance policy with an insolvent insurer would have been personally liable for the full amount of any damages caused by the policyholder's tortious conduct.
[Id. at 219-20, 869 A.2d 964.] (citations omitted).
In this light, but for the settlement agreement, Cudia would have been personally liable for any damages beyond PLIGA's payment of its statutory maximum under the primary policy, at least up to the *60 limits of that policy. The record here is devoid of any information concerning Cudia's personal financial worth. We do not know if plaintiffs engaged in any pre-judgment discovery as to Cudia's assets, or investigated his future income potential as a physician. We are left only with the impenetrable protection provided by the settlement agreement.
Based on these facts, we do not address here whether our holding would be different, if a plaintiff provided a clear record that he/she had exhausted all reasonable means to collect against a judgment-proof tortfeasor. In such a case, the remedy may lie in treating a plaintiff's docketed judgment against the tortfeasor for the full amount of the "coverage-gap" (the difference between the limits of the primary coverage and PLIGA's payment of its statutory maximum) as the functional equivalent of actual payment, thus triggering coverage under the excess policy.
Despite plaintiffs' well-founded concerns, our function here is to interpret the contract of insurance before us, using long-established tools of construction, not to rewrite the contract by imposing our own notions of public policy by judicial fiat. It is well-settled that the insured bears the burden of establishing that a claim lies within the policy's scope of coverage. F.S. v. L.D., 362 N.J.Super. 161, 166, 827 A.2d 335 (App.Div.2003); Sears Roebuck and Co. v. Nat'l Union Fire Ins. Co., 340 N.J.Super. 223, 234, 774 A.2d 526 (App. Div.), certif. denied, 169 N.J. 608, 782 A.2d 426 (2001). See also Cobra Prods., Inc. v. Fed. Ins. Co., 317 N.J.Super. 392, 401, 722 A.2d 545 (App.Div.1998), certif. denied, 160 N.J. 89, 733 A.2d 494 (1999). Furthermore, if the terms delineating coverage are clear and unambiguous, they must be enforced as written. United States Mineral Prods. Co., v. Am. Ins. Co., 348 N.J.Super. 526, 538-39, 792 A.2d 500 (App.Div.2002).
Here, there is no question that the language used to describe the "coverage-trigger" clearly communicates that, as condition of coverage under the excess policy, the limits of the underlying primary policy must be paid. Because the settlement reached by the parties leaves a coverage-gap between the limits of the primary policy and PLIGA's statutory maximum, there is no enforceable coverage under the excess policy.
Reversed.
NOTES
[1] We use the term "coverage-trigger" in the same manner the Supreme Court used the term "trigger of coverage" in Owens-Illinois v. United Ins. Co., 138 N.J. 437, 441, 650 A.2d 974 (1994), meaning "a shorthand expression for identifying the events that must occur during a policy period to require coverage for losses sustained by the policyholder."
[2] In the course of oral argument, we requested PLIGA's counsel to advise us, through a supplemental post-argument submission, whether the specific coverage language contained in the excess policy had been filed with, or otherwise reviewed or approved by the Commissioner of Insurance. In response, counsel has advised us that as result of the Commercial Insurance Deregulation Act of 1982, N.J.S.A. 17:29AA-1 to -32, excess insurance polices are no longer required to be filed with the Commissioner of Insurance. See N.J.S.A. 17:17:29AA-3(k).
[3] The trial court held that plaintiffs had a covered claim under the Toms River policy. Although PLIGA argued against this ruling at the trial level, it did not appeal the judgment as to this issue.
[4] Plaintiffs also rely on an unpublished appellate court opinion from the State of Ohio. Rushdan v. Baringer, 2001 WL 1002255, 2001 Ohio App. LEXIS 3827 (Ohio Ct.App.2001). Confronted with facts similar to this case, and construing a statute containing the same provisions as the New Jersey Guaranty Act, the Ohio appellate court compelled their fund of last resort to pay excess coverage. We decline to follow the reasoning of this unpublished opinion from a sister state.