792 A.2d 500 (2002)
348 N.J. Super. 526
UNITED STATES MINERAL PRODUCTS COMPANY, Plaintiff-Respondent,
v.
AMERICAN INSURANCE COMPANY; Continental Casualty Company; Continental Insurance Company; Federal Insurance Company; Hartford Fire Insurance Company; Home Insurance Company; Insurance Company of North America; National Union Fire Insurance Company of Pittsburgh, Pennsylvania; New Jersey Property-Liability Insurance Guaranty Association; North River Insurance Company; Puritan Insurance Company; St. Paul Fire and Marine Insurance Company; United States Fidelity and Guaranty Company; Alexander & Alexander, Inc., Defendants,
and
Twin City Fire Insurance Company, Defendant-Appellant.
Superior Court of New Jersey, Appellate Division.
Argued October 3, 2001.
Decided March 7, 2002.
*501 William J. Bowman (Hogan & Hartson) of the Washington D.C. bar, admitted pro hac vice, argued the cause for appellant (Purcell, Ries, Shannon, Mulcahy & O'Neill, attorneys; William P. Ries, of counsel, Michael F. O'Neill, Bedminster and Mr. Bowman and Paula P. Skalaban (Hogan & Hartson), on the brief).
Anthony Bartell, Newark, argued the cause for respondent (McCarter & English, attorneys; Mr. Bartell, of counsel, and Teresa L. Moore, on the brief).
Before Judges BAIME, FALL and AXELRAD.
The opinion of the court was delivered by FALL, J.A.D.
In this declaratory judgment action between a manufacturer of asbestos-containing products and its insurers, we examine the issue of whether an extension of an *502 excess-coverage insurance policy for a shortened period less than the original policy period creates an additional set of aggregate policy limits. We also consider the question of whether that policy provides a single per occurrence limit regardless of the number of aggregate limits provided.
At the request of plaintiff, United States Mineral Products Company (USM), defendant, Twin City Fire Insurance Company (Twin City), issued an endorsement to its existing excess-coverage policy extending coverage for a two-week period, with all other terms of the existing policy to remain the same, in return for a prorated premium, to allow USM's excess-coverage insurance program to coincide with expiration of USM's underlying primary-coverage policies.
We hold that in the absence of unambiguous policy language to the contrary, an insured who pays a prorated premium for insurance coverage for an additional period with all other terms of the policy to remain the same would reasonably expect that such a prorated premium reflects only the insurer's reduced time on the risk, not a reduction in the policy's aggregate coverage limits. Accordingly, the two-week short-term policy extension issued here is construed as containing the same aggregate coverage limit as provided in the original excess-coverage insurance policy.
We also hold that in accordance with the reasoning set forth in Owens-Illinois, Inc. v. United Ins. Co., 138 N.J. 437, 650 A.2d 974 (1994) and Carter-Wallace, Inc. v. Admiral Ins. Co., 154 N.J. 312, 712 A.2d 1116 (1998), the subject Twin City excess-coverage policy provides a separate per occurrence limit for each of the policy's aggregate periods.
These issues arose in the following factual and procedural context. From 1954 through 1971, USM or its predecessor companies manufactured products containing asbestos. More than 15,000 asbestos-related cases have been filed against USM nationally in which claimants have alleged personal injuries arising from alleged exposure to asbestos or asbestos-containing products manufactured and sold by USM. Additionally, more than 200 asbestos-related cases have been filed against USM alleging property damage due to installation of asbestos-containing products manufactured and sold by USM in buildings throughout the country. Approximately 500 asbestos-related cases have been instituted against USM in the courts of New Jersey.
USM was insured under various primary, umbrella, and excess standard-form comprehensive general liability (CGL) insurance policies covering personal injury and property damage caused by use of its products. Twin City, along with several of the insurer defendants, sold USM multi-period excess-coverage policies that included policy periods of less than one year.
On July 8, 1992, USM filed a declaratory judgment action against fourteen insurance companies from whom it had purchased primary, umbrella, and excess-coverage general liability insurance policies, including Twin City, seeking a defense and coverage concerning thousands of claims made against it for asbestos-related personal injury and property damage allegedly sustained as a result of the use of asbestos-containing products manufactured and sold by USM.
Relevant to the specific coverage issues between USM and Twin City, USM moved for entry of partial summary judgment against defendant, Puritan Insurance Company, on the issue of whether the issuance by Puritan of an extension of its excess-liability policy to USM created a new aggregate limit for the period of extension. *503 The motion was argued and decided by the trial court on July 2, 1996. In ruling that the issuance to USM by Puritan of a ninety-day extension of its policy made available a new set of aggregate limits applicable to the period of the policy extension, the motion judge stated, in pertinent part:
The argument before the Court is whether or not the language of the period of coverage that is in question gives rise to a new aggregate limit or provision of coverage by defendant ... Puritan[.]
....
The underlying facts, as I've indicated, are not in substantial dispute. [USM] carried both primary and excess coverage for a period of many years through the 1970s and into the 1980s....
....
Puritan had issued ... a series of annual policies coverage which carried with it a five million dollar per occurrence and with a five million dollar annual aggregate limit to coverage. Clearly aggregate limits to coverage are sole benefits to the issuing insurance company because it particularly identifies for them the maximum exposure under particular risks so they can in any way that seems appropriate to them underwrite the policy and determine the premium costs for that particular coverage.
....
In the instant case, [USM] had decided to revamp its insurance program and wished to carry forward a period of coverage which would exceed the termination of the original annual contract..., to run it over to the beginning of its new insurance program. It was an occurrence policy as was the coverage that was issued sequential to it. And by definition, because it was an occurrence policy, neither party at that time had in its possession specific firsthand affirmative knowledge as to the amount of claims that were made or could be made or the degree to which the aggregate would be exhausted.
So, both parties when they entered into the contract of coverage, whether you call it stub policy, whether you call it something analogous to renewal, I'm not sure the labels are particularly helpful to the Court in concluding what was provided by the agreement. Of course, the first guide post that any court should use is the language of the contract[.]....
....
There was a request for coverage for a period that was not covered in the annual coverage concluding in May and which Puritan was not required to sell. Puritan could sell it, not sell it, do as it saw fit. They saw fit to sell a period of coverage that they were not otherwise required to do so.
Counsel for defendant argues that we must call this an extension and that that semantic definition carries with it a series of legal sequelae which have great substance.
In analyzing all the cases that the parties have cited, ... the Court concludes that it is of no logical significance to try to evaluate the name this thing we are here about. The truth of the matter is that Puritan could have at that time decided not to sell anything, had no coverage, and concluded whatever coverage they did. Having sold a period of coverage that they were not required to do, it is in essence a new contract. It is a contract wherein the parties agree to use terms of previous coverage so that the simple extension says that this policy is issued and it says that with the extension over time it relies on all the *504 previous terms and definitions in the earlier policy.
The question for this Court is what did that language convey as an understanding to the parties as to what they were purchasing? Objective reasonable intent is merely an [aid] in or an expectation is merely an [aid] in discerning or divining, if you will, what the parties had expected to get and what reasonably they sold.
In the instant case, I am satisfied that the Court must apply some logical conclusion as to what occurred. What occurred? Defendant would have me ... find that an important component of coverage... was indeed no coverage at all, it was merely a ... new reporting period by which to exhaust previous claims which are concededly far now in excess of the coverage here.
If that was such an important and significant limitation, ... that clearly is something I am satisfied should have been made clear in the contracting language. If you were going to sell coverage for a ninety day period which was guided by the earlier policy limits, it seems to me that absent some disclosure that there was an important part of the earlier coverage which was not now available, that the insurance company does so at its own risk in construction of the policy at a later date.
In essence, because insurance policies can only be determined by later developments, what in essence was happening was that [USM] was buying coverage which excluded a significant material component and that was for the five million dollar aggregate for product liability and for occupational injury or disease.
Quite clearly a contract of insurance purchases coverage for a period of time certain. By accepting a quarter premium for a quarter year reduced the exposure of the ... insurance company to certain claims. It, therefore, should have reflected the full terms and full coverage of the earlier policy.
Counsel for defendant argues that annual limit means annual limit and anything less than a year is less than that, but the analogy to an extension or as to a cancellation of policy is a logically applicable way of analyzing the problem. You pay for a limited period of coverage. That reduces the carrier's exposure to a particular risk, which is why they agree to accept the risk at a reduced premium.
I am satisfied that the [Diamond Shamrock Chemicals v. Aetna, 258 N.J.Super. 167, 609 A.2d 440 (App.Div. 1992), certif. denied, 134 N.J. 481, 634 A.2d 528 (1993)] case may be distinguished on the basis asserted by plaintiff. Diamond Shamrock dealt with both primary and surplus coverage.
I am further satisfied that Diamond Shamrock's distinction in regard to the issuing language of the policy of coverage leads this Court to the conclusion that I am not bound to follow what in essence as it reflects to this case is not binding. The fact that the Diamond Shamrock [case] concluded that the thirty day coverage was ... an extension of the per occurrence limit for an additional month, given the distinctions between that case and this, I am satisfied that I am not bound to it.
Likewise, while I am not required to follow out of state decisions which apply different law, I may accept reasoning that the Court finds persuasive and logical. In this case, I am satisfied that the analysis and distinction dealt with in [The Flintkote Co. v. American Mutual Liability Ins. Co. (Mealey's, Vol. 6, # 48, No. 808-594[)] (Cal. Sup.Ct., Dept. No. 12, Proposed Statement of Decision, *505 Aug. 17, 1993)] decision in California is a persuasive evaluation and analysis of the argument in question.
....
Clearly in this case, if in fact there is a reasonable expectation argument to be made, the clear implication is a reasonable expectation of paying one quarter premium for the same coverage means precisely that. All that's reduced is the period of exposure to the coverage which is reflected by the lesser premium. To presuppose that they should pay or anyone should pay a one quarter premium for a one quarter coverage but for significantly less coverage that's included because the aggregate clearly has been exhausted or will be exhausted or the claims that are made clearly will exhaust the aggregate would certainly fly in the face of any analysis, especially dealing with the cancellation program.
I am satisfied under all these circumstances that the issuance of the ninety day extension policy, whether you call it extension, whether you call it stub, whether you call it renewal, whether you call it a new policy, reflects an agreement of the language which imposes upon the defendant Puritan in this case the issuance of not only a five million dollar per occurrence, but a five million dollar annual aggregate which should be available under the terms of the policy here. The Court so rules.
Turning our attention to the specific issues between Twin City and USM, Twin City sold USM a third-layer excess liability insurance coverage under policy number TXS 103131 for the approximately fifteen-month policy period August 8, 1983 through November 11, 1984, for the sum of $5,040. Under paragraph 4 of the declarations, "Limits of Liability," the limits of Twin City's liability under the policy, "subject to all the terms of the policy relating thereto," were as follows:
$10,000,000 EACH OCCURRENCE/AGGREGATE WHERE APPLICABLE PART OF $14,000,000 EACH OCCURRENCE/AGGREGATE WHERE APPLICABLE
Accordingly, the policy provided a maximum of $10 million in coverage for any one occurrence and, regardless of the number of occurrences, the policy also provided a maximum of $10 million in coverage in the aggregate. Another insurer provided the remaining $4 million in coverage per occurrence and in the aggregate in the same layer of excess coverage. Therefore, Twin City had a "quota share" of that layer, requiring it to pay ten-fourteenths of any covered claim that reached the layer, subject to its per occurrence and aggregate limits.
Pursuant to Section I, "INSURING AGREEMENT," the policy provides, in part:
The company will indemnify the insured for ultimate net loss in excess of the underlying insurance stated in item 5 of the declarations, but not in excess of the company's limit of liability stated in item 4 of the declarations.
In accordance with paragraph 5 of the policy declarations, "Total Limits of LiabilityAll Underlying Insurance Policies," the coverage is:
$20,000,000 EACH OCCURRENCE/AGGREGATE WHERE APPLICABLE
This identifies the limits of the underlying coverage as $20 million, whereas paragraph 4 lists the limits of the Twin City policy as $10 million per occurrence and in the aggregate, part of a $14 million per occurrence and aggregate limit.
Paragraph 6 of the declarations section of the Twin City policy states that the *506 policy "shall follow the terms, conditions, definitions and exclusions of the controlling underlying insurance policy" issued by Integrity Insurance Company. However, Section I also states that "[e]xcept as otherwise provided by this policy, the insurance afforded herein shall follow the terms, conditions, definitions and exclusions of the controlling underlying insurance policy designated in item 6 of the declarations."
Endorsement No. 8 to the Twin City policy identifies two separate annual $10 million aggregate periods, as follows:
APPLICATION OF AGGREGATE ENDORSEMENT
IT IS AGREED THAT FOR THE PURPOSE OF THIS INSURANCE THE ANNUAL AGGREGATE PERIODS SHALL APPLY AS FOLLOWS:
1ST FROM 8-1-83 TO 11-11-83
2ND FROM 11-11-83 TO 11-11-84
On February 2, 1984, USM purchased additional coverage from Twin City for the two-week period from November 11, 1984 through November 25, 1984. This is reflected in Endorsement No. 12, which states, in pertinent part:
IN CONSIDERATION OF THE ADDITIONAL PREMIUM CHARGE OF $152.00, IT IS AGREED THAT THE POLICY PERIOD IS AMENDED TO EXPIRE AS FOLLOWS:
NOVEMBER 25, 1984
ALL OTHER TERMS AND CONDITIONS REMAIN THE SAME.
THE EFFECTIVE DATE OF THIS ENDORSEMENT IS NOVEMBER 25, 1984.
THIS ENDORSEMENT IS ATTACHED TO AND MADE PART OF TXS 103131 ISSUED TO [USM] BY [TWIN CITY].
On or about September 16, 1996, USM filed a motion for partial summary judgment against several of the insurers, including Twin City, seeking a ruling, consistent with the court's July 2, 1996 decision on the Puritan Insurance Company issue, that the insurers' stub, extension, or short-term policies provided additional full aggregate liability limits applicable to USM's asbestos claims.
Twin City opposed the motion and cross-moved for partial summary judgment, seeking an order determining, (1) that the Twin City policy period extension did not create new aggregate policy limits and, (2) a declaration that the Twin City policy provided only a single-occurrence limit for USM's asbestos-related claims.
The motions were argued before Judge Hamlin on October 24, 1996. In a written opinion dated December 2, 1996, the court granted USM's motion for partial summary judgment and denied Twin City's motion. An order memorializing those rulings was executed on December 23, 1996. In analyzing the issues, Judge Hamlin stated, in pertinent part:
National Union Fire Insurance Company of Pittsburgh, Pa., Hartford Fire Insurance Company and Twin City Fire Insurance Company ... sold general liability insurance coverage to USM between May 8, 1979 and May 14, 1984. These policies are standard form policies, similar to each other and to Puritan's policy. Each of these policies requires the insurer to pay "all sums" USM becomes obligated to pay as the result of bodily injury or property damage claims brought against it. Each of these policies contains aggregate liability limits and provides that the aggregate limit applies to each "annual period." Each of these policies was extended for a period of less than one year in exchange for additional prorated premiums. In addition, the policies sold by National Union and *507 Twin City contain a cancellation procedure whereby the insurer can cancel the policy and retain a pro rated premium, but still must pay full aggregate limits.
....
Twin City sold USM excess umbrella liability insurance for the period August 8, 1983 through November 11, 1984. The policy provides $10 million in aggregate policy limits. This policy expressly identifies two distinct "annual aggregate periods," both of which afford $10 million aggregate limits. On February 2, 1984, Twin City sold USM additional coverage for the period November 11, 1984 through November 25, 1984. The premium USM paid for two additional weeks of coverage represents slightly more than a pro rata portion of the $5,040 premium paid for the initial policy.
....
[USM] argue[s] that this Court correctly found that an insured who pays an additional prorated premium for additional coverage identical to that provided by the original policy reasonably would expect that its prorated premium reflects only the insurer's reduced time on the risk, not a reduction of aggregate limits. [Twin City] argue[s] that the doctrines of reasonable expectations and contra proferentum do not apply here. [Twin City] maintain[s] that on the basis of the plain reading of the policies and appropriate case law, such extensions do not create additional aggregate limits.
....
Insurance policies are consistently distinguished from other contracts by our Supreme Court. New Jersey recognizes special rules for their construction and application.... The unique nature of insurance policies and the courts' distinct interpretation rules arise from the standardization of insurance policy language, the need, in the case of casualty insurance, to compensate innocent third parties for injury or damage caused by the insured and duty, imposed by law, requiring the insurer to place its policyholder's interests above their own.... Three fundamental principles of law govern insurance coverage:
(1) the objective in construing the policies' coverage of liability must be to give effect to the policies' dominant purpose of indemnity; (2) ambiguity in an insurance contract must be construed in favor of the insured; and (3) the court should ordinarily strive to give effect to the objectively reasonable expectations of the insured.

Keane [Keene] Corp. v. Insurance Co. of North Am., 667 F.2d 1034, 1041 (D.C.Cir.1981), cert. denied, 455 U.S. 1007[, 102 S.Ct. 1644, 71 L.Ed.2d 875] (1982). To achieve objective equity among policyholders, courts have adopted the principle of the insured's objectively reasonable expectations:
The objectively reasonable expectations of applicants and intended beneficiaries regarding the terms of insurance contracts will be honored even though painstaking study of the policy provisions would have negated those expectations.

Keaton, Insurance Law Rights at Variance with Policy Provisions, 83 Harv. L.Rev. 961, 967 (1970). The New Jersey Supreme Court consistently has applied the reasonable expectations principle in favor of coverage for corporate policyholders....
....
An insured who pays an additional prorated premium for additional coverage identical to that provided by the initial policy reasonably would expect that such a prorated premium reflects only the *508 insurer's reduced time on the risk, not a reduction of the policy's aggregate limits. This Court rejected the insurer's contentions that the stub policies sold to USM in exchange for additional prorated premiums provided no additional aggregate limits, but merely extensions of time for which those insurers were on the risk. This contravenes the policy language and USM's reasonable and actual coverage expectations.
In Diamond Shamrock Chems. Co. v. Aetna Cas. & Surety Co., 258 N.J.Super. 167[, 609 A.2d 440] (App.Div.1992), cert. denied, 134 N.J. 481[, 634 A.2d 528] (1993), American Re-insurance Co. issued an excess policy with a $3 Million per occurrence limit to Diamond Shamrock for a three-year policy period, February 1, 1966 through February 1, 1969. The policy did not contain language creating a new limit for each annual period. Id. Diamond Shamrock asked [American] to extend the policy period for 30 days in order to make it concurrent with the underlying primary coverage. [American] agreed, and a binder was issued by the insureds['] broker, extending the policy for 30 days. Diamond Shamrock argued in the trial court that this one month extension should be treated as a new policy, creating a separate limit. The trial court rejected this contention and ruled that no new limit was created. On appeal, the Appellate Division affirmed, agreeing that the 30 day policy extension was simply a continuation of the existing policy that created no new limit. Id. at 225-226[, 609 A.2d 440].
This Court distinguishes Diamond Shamrock on the basis that Diamond Shamrock dealt with both primary and surplus coverage. The excess policies in Diamond Shamrock, all of them, including the [American] policy, did not contain aggregate limits. Those policies contained only per occurrence limits which, by the terms of the policy, unlike those here, were not confined to each annual period. Diamond Shamrock poses many distinctions from this case, satisfying this Court that it is not bound to follow that, which in essence, is not binding.
This Court is satisfied that the issuance of an extension policy for the period of less than one year is an extension, whether you call it a "stub," a "renewal" or a "new policy." It reflects an agreement in the language which imposes upon the insurer the issuance of not only a dollar amount per occurrence, but also a dollar amount annual aggregate. For the reasons stated above, this Court affirms its earlier ruling.... USM's motion for partial summary judgment on the issue is granted. This Court rules that the stub policies issued by these insurers create an additional set of aggregate limits that should be available under the policies here.
[Other citations omitted.]
Twin City's motion for leave to appeal was denied by an order entered by this court on February 28, 1997.
On October 9, 1998, Twin City filed a motion seeking an order reconsidering and vacating the December 23, 1996 order, and a ruling that the Twin City policy provided only a single-occurrence limit for USM's asbestos-related claims and that the Twin City two-week policy period extension did not create a new aggregate policy limit.
Thereafter, and prior to that motion being heard, USM settled its coverage claims with all defendant insurers with the exception of Twin City. However, USM and Twin City entered into a settlement agreement under which all claims between them were resolved with the exception of the issues ruled on in the December 23, 1996 *509 order. An order of judgment was entered on May 11, 2001, dismissing with prejudice all remaining claims between USM and Twin City, preserving the right of Twin City to appeal from the terms of the December 23, 1996 order.
On May 23, 2001, Twin City filed a notice of appeal. On July 3, 2001, we entered an order accelerating the appeal.
On appeal, Twin City presents the following arguments for our consideration:
POINT I
STANDARD OF REVIEW
POINT II
THE TWIN CITY POLICY CONTAINS A SINGLE PER OCCURRENCE LIMIT, AND THE ASBESTOS CLAIMS AGAINST USM ARISE OUT OF A SINGLE OCCURRENCE.
A. The Twin City Policy Provides a Single Per Occurrence Limit of Liability.
1. The Twin City Policy Contains Separate Per Occurrence and Aggregate Limits of Liability.
2. The Court Should Apply The Twin City Policy's Plain Meaning.
POINT III
THE TWIN CITY POLICY UNAMBIGUOUSLY PROVIDES A SINGLE PER OCCURRENCE LIMIT FOR THE ENTIRE POLICY PERIOD.
POINT IV
NO ADDITIONAL OCCURRENCE LIMIT IS CREATED BY THE FACT THAT THE POLICY PERIOD IS GREATER THAN TWELVE MONTHS.
POINT V
ALTERNATIVELY, THE TWO WEEK EXTENSION OF THE TWIN CITY POLICY PERIOD DID NOT CREATE AN ADDITIONAL AGGREGATE LIMIT OF LIABILITY.
1. The Twin City Policy Extension, Provided As An Accommodation To USM, By Its Clear Terms Did Not Create An Additional Aggregate Limit.
2. A Brief Extension Of A Policy Period Does Not Create Additional Limits.
3. The Trial Court's Reasoning About the Aggregate Limit Issue Was Misguided.
4. The Trial Court's Attempt to Distinguish Diamond Shamrock Fails.
5. The Trial Court Incorrectly Analogized A Brief Policy Extension To Cancellation Of An Existing Policy.
I
There are special rules applicable to the interpretation of an insurance policy. As with any contract our function on review is to search broadly for the probable intent of both parties in an effort to find the reasonable meaning in maintaining the express general purposes of the policy. Erdo v. Torcon Const. Co., Inc., 275 N.J.Super. 117, 120, 645 A.2d 806 (App.Div.1994).
When examining an insurance contract, the first step is to determine whether the policy is ambiguous. Pittston Co. Ultramar America Ltd. v. Allianz Ins. Co., 124 F.3d 508, 520 (3rd Cir.1997). If a court determines that the policy is clear and unambiguous the policy must be enforced as written. Cobra Products v. Federal Ins. Co., 317 N.J.Super. 392, 400, 722 A.2d 545 (App.Div.), certif. denied, 160 N.J. 89, 733 A.2d 494 (1999). However, if the policy clause is found to be ambiguous, any ambiguities must be resolved against the insurance carrier and in accordance with the objectively reasonable expectations of the insured. Lilliston Chrysler v. *510 Universal, 329 N.J.Super. 318, 324, 747 A.2d 815 (App.Div.2000).
A policy provision is considered ambiguous if the phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage. Weedo v. Stone-E-Brick, Inc., 81 N.J. 233, 247, 405 A.2d 788 (1979). If the policy is considered ambiguous, the reviewing court should determine whether more precise language by the insurer, had such language been included in the policy, would have put the matter beyond reasonable question. Gibson v. Callaghan, 158 N.J. 662, 670, 730 A.2d 1278 (1999).
II
In the light of these well-settled principles of construction, we first address Twin City's arguments that its policy contains a single occurrence limit and that the claims against USM arise out of single occurrence. Although largely unaddressed by the trial court, after carefully reviewing the record in the light of the written and oral arguments presented by the parties, we conclude these claims by Twin City are without merit. Our courts have held that progressive injury or damage from exposure to asbestos are treated as an "occurrence" within each of the years of a comprehensive general liability policy, which is the "continuous-trigger" theory for activating the insurers' obligation to respond under the policies. Owens-Illinois, supra, 138 N.J. at 445-46, 650 A.2d 974.
In Owens-Illinois, the Court examined two coverage issues between a manufacturer of an asbestos-containing product and its insurer in cases where the injury or property damage is gradually inflicted.
The first was the so-called "trigger of coverage" issue, "a shorthand expression for identifying the events that must occur during a policy period to require coverage for losses sustained by a policyholder." Id. at 441, 650 A.2d 974.
The second was the "allocation issue," "which involves the scope of coverage afforded under a triggered policy." Ibid.
From 1948 to 1958, Owens-Illinois manufactured and distributed a thermal insulation product that contained approximately fifteen percent asbestos. Id. at 442-43, 650 A.2d 974. From September 1, 1963 to September 1, 1977, Owens-Illinois was insured under excess indemnity umbrella insurance policies issued by Aetna Casualty and Surety Company. Id. at 443, 650 A.2d 974. Those policies contained self-insured deductible amounts, and "[a]bove the deductible amount, the policies provided that Aetna would cover [Owens-Illinois'] `ultimate net loss' ... up to the `aggregate annual' and `per occurrence' limits of the policies." Ibid. The aggregate annual and per-occurrence limits of the Aetna policies were the same within each policy. Ibid.
Thereafter, Owens-Illinois revamped its insurance program, which included the formation of Owens Insurance Limited (OIL), a "captive insurance company," a wholly-owned subsidiary of Owens-Illinois. Id. at 442-43, 650 A.2d 974. OIL was managed, for a fee, by American Risk Management (ARM), which arranged to reinsure policies issued to Owens-Illinois by OIL with policies issued by other insurance companies. Id. at 443, 650 A.2d 974.
In June 1977, Owens-Illinois sought quotes to replace its Aetna insurance coverage, due to expire on September 1, 1977, with a comprehensive general liability (CGL) policy covering general and products liability. Ibid. Owens-Illinois accepted ARM's proposal to provide a CGL insurance package that was structured with the following components: a $250,000 per occurrence self-insured reserve; primary coverage above the self-insured amount up *511 to $1 million per occurrence; and excess umbrella policy limits of $50 million. Defendant, United Insurance Company (United), provided the primary coverage. OIL issued the excess umbrella policy and reinsured with various companies, including United and other defendants. Id. at 443-44, 650 A.2d 974.
Toward the end of 1977, Owens-Illinois became aware of a number of asbestos-related lawsuits involving its asbestos-containing product and, in early 1978, gave notice of those claims to Aetna, its carrier from September 1, 1963 to September 1, 1977. Id. at 444, 650 A.2d 974.
Aetna took the position that "the policy in effect when the disease manifested itself should respond to the claim." Ibid. Aetna rejected the claims submitted, insisting that the $250,000 self-insured reserve was a per-claim figure, and none of the reported claims called for coverage under its policies. Ibid.
As the claims increased, Owens-Illinois assumed the claim manifestation dates were beyond the Aetna policy periods and, in 1980, gave formal notice of the asbestos claims to United and other defendant-insurers. United and the other defendant-insurers maintained "that the trigger of coverage was the exposure to the product and not the manifestation of the disease[,]" and declined coverage. Id. at 444-45, 650 A.2d 974.
The trial court held that an "injury in fact," triggering coverage, occurs on the inhalation of asbestos fibers and continues up to and including manifestation of an asbestos-related case. The trial court also ruled that all insurers whose policies were so triggered were "jointly and severally liable to [Owens-Illinois] to the extent of the policy limits[,]" and "that the continuous trigger should apply to claims for property damage." Id. at 445, 650 A.2d 974.
In briefly discussing the issue of whether the $250,000 self-insured reserve was on a per-occurrence or a per-loss basis, the Court noted that the trial court, "consistent with other jurisdictions, ... held that the $250,000 [self-insured reserve] applied not to individual claims but to the aggregate of exposures due to a single condition during the policy period." Ibid. (citing to Owens-Illinois v. Aetna, 597 F.Supp. 1515, 1525 (D.D.C.1984)). As to that issue, we held that "the manufacture and sale of [the asbestos-containing product] must be regarded as the single occurrence triggering liability for asbestos-related injury or damage. [Owens-Illinois'] coverage is thus subject to a single deductible for each policy period." Owens-Illinois, Inc. v. United Ins. Co., 264 N.J.Super. 460, 503, 625 A.2d 1 (App.Div.1993).
In addressing the trigger of coverage issue the Court stated, in pertinent part:
Not surprisingly, the answer to the trigger-of-coverage question varies by jurisdiction. The most frequently offered theories for trigger of coverage are (1) the exposure theory, (2) the manifestation theory, and (3) the continuous-trigger theory.
....
The conceptual underpinning of the continuous-trigger theory ... is that injury occurs during each phase of environmental contamination-exposure, exposure in residence (defined as further progression of injury even after exposure has ceased), and manifestation of disease.
....
Certain things are well settled: As a general rule, the time of the occurrence of an accident within the meaning of an indemnity policy is not the time the wrongful act is committed but the time when the complaining party is actually damaged....
*512 ....
The "overwhelming weight of authority" elsewhere acknowledges the progressive nature of asbestos-induced disease, and affirms that "`bodily injury' occurs when asbestos is inhaled and retained in the lungs." ... [W]e are satisfied, like most American jurisdictions, that medical science confirms that some injury to body tissue occurs on inhalation of asbestos fibers, and that once lodged, the fibers pose an increased likelihood of causing or contributing to disease.... See also Fischer v. Johns-Manville Corp., 103 N.J. 643, 660-61 n. 2, 512 A.2d 466 (1986) in which we recognized the progressive nature of asbestos-related disease.
....
[I]n the context of this case ..., we hold that claims of asbestos-related property damage from installation through discovery or remediation (the injurious process) trigger the policies on the risk throughout that period.... We shall concentrate in this opinion primarily on the issues of asbestos-related personal injury.
Accepting that inhalation of asbestos fibers causes some injury to tissue, does that trigger coverage under a CGL policy? Many courts have answered that question by finding ambiguity in the language of the policy and construing the policy in favor of the policyholders....
....
[W]e do not find ambiguity in the language of the "occurrence" clause. The words are all familiar and easily understandable. "The plain meaning of the `occurrence' clause is no secret to the parties." ...
What is not so easily understandable is the point at which the law will say that injury requires indemnity. In that sense, the concept of injury, like the related concepts of duty and causation, is an instrument of policy. After all, the air we breathe and the water we drink contain trace elements of toxic substances. The law decides when an invasion of the body constitutes an injury entitling one to damages.
....
Our own law has drawn the line on liability to indemnify for injury in different ways in different contexts....
....
Our concepts of legal causation were developed in an age of Newtonian physics, not of molecular biology. Were it possible to know when a toxic substance clicks on a switch that alters irrevocably the composition of the body and before which no change has "occurred," we might be more confident that occurrence-causing damages had taken place during a particular policy period. The limitations of science in that respect only compound the limitations of law....
Massive-exposure toxic-tort cases have simply exceeded the capacity of conventional modes of judicial response.
....
[C]ourts must adapt common-law doctrines "to the peculiar characteristics of toxic-tort litigation." [Ayers v. Township of Jackson, 106 N.J. 557, 581, 525 A.2d 287 (1987).] We advert to those principles because we believe that common-law resolution of the trigger-of-coverage issue requires that we consider, at the same time, the issue of scope of coverage if a policy is triggered....
....
Assuming that every phase from exposure to manifestation of disease is a period of continuous bodily injury, does that trigger the sum of all policies in force during the years of exposure, exposure *513 in residence, and manifestation?...
....
The problem is how to apply the abstract concepts of law and the related provisions of the insurance contract to the realities of environmental disease. The legal concepts of injury, defect, negligence, and damages are well-suited to the prototype accident of an exploding steam boiler. A defective weld in a boiler may have been present years before but the occurrence (an explosion) and the attendant injuries are easily identified as falling within a particular policy period. Even though "all sums" due from the accident might not be known with certainty at the time of the explosion, by the time of trial a claimant would be able to establish, within a reasonable degree of medical probability, what damages would flow from the injury.
That is not so in the case of gradual release of contaminants. Even in cases such as Ayers, supra, 106 N.J. 557, 525 A.2d 287, in which bodies were admittedly exposed to damaging contaminants, "all sums" due because of the injury cannot be determined in each of the years of exposure or exposure in residence, and perhaps not even when there has been a manifestation.
....
We are unable to find the answer to allocation in the language of the policies. The occurrence clauses undoubtedly contemplated indemnity for provable damages incurred by the policyholder because of injury that occurred during the policy period. The continuous-trigger theory coupled with joint-and-several liability is premised on a tenuous foundation: that at every point in the progression the provable damages due to injury in any one of the years from exposure to manifestation will be substantially the same[.] ... As we have seen, our law has been developing in a different manner.
....
[T]he public interest factors set forth in Ayers, supra, 106 N.J. at 608-10, 525 A.2d 287, serve to guide us. Among the factors that we should consider is the extent to which our decision will make the most efficient use of the resources available to cope with environmental disease or damage.... One of the principles of such decision-making is to provide incentives that parties should engage in responsible conduct that will increase, not decrease, available resources.... Among the costs of a product, direct or indirect, are the costs of risk management.
....
The theory of insurance is that of transferring risks. Insurance companies accept risks from manufacturers and either retain the risks or spread the risks through reinsurance.... Because insurance companies can spread costs throughout an industry and thus achieve cost efficiency, the law should, at a minimum, not provide disincentives to parties to acquire insurance when available to cover their risks. Spreading the risk is conceptually more efficient.
Almost all such insurance controversies are retrospective, and to reflect now on what might have been done if the parties had contemplated today's problem is almost fatuous. Our job, however, is not just to solve today's problems but to create incentives that will tend to minimize their recurrence....
....
We will not attempt a universal resolution of all issues of coverage for gradual release of pollutants or toxins. At least in the context of asbestos-related *514 personal injury and property damage, the rules that we adopt will attempt to relate the theory of a continuous trigger causing indivisible injury to the degree of risk transferred or retained in each of the years of repeated exposure to injurious conditions. In the absence of a satisfactory measure of allocation..., we believe that straight annual progression is not an appropriate measure of allocation. The degree of risk transferred or retained in the early years of an enterprise like [Owens-Illinois's] obviously was not at all comparable to that sought to be insured in later years. Hence, any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure. We believe that measure of allocation is more consistent with the economic realities of risk retention or risk transfer. That later insurers might need to respond to pre-policy occurrences is not unfair. "These are `occurrence' policies which, by their nature, provide coverage for pre-policy occurrences (acts) which cause injury or damage during the policy period." ... In this case, the year-by-year increase in policy limits must have reflected an increasing awareness of the escalating nature of the risks sought to be transferred. We believe that a better formula ... is that developed in California. In [Armstrong World Indus., Inc. v. Aetna Casualty & Sur. Co., 25 Cal.App. 4th 1316, 26 Cal.Rptr.2d 35, 57 (1993), review granted sub nom. In re Asbestos Ins. Coverage Cases, 27 Cal.Rptr.2d 488, 866 P.2d 1311 (1994)], the court allocated the losses among the carriers on the basis of the extent of the risk assumed, i.e., proration on the basis of policy limits, multiplied by years of coverage.
....
We realize that many complexities encumber the solution that we suggest involving, as it does, proration by time and degree of risk assumed-for example, determining how primary and excess coverage is to be taken into account or the order in which policies are triggered.... Still, we do not believe that the issues are unmanageable....
....
To recapitulate, we hold that when progressive indivisible injury or damage results from exposure to injurious conditions for which civil liability may be imposed, courts may reasonably treat the progressive injury or damage as an occurrence within each of the years of a CGL policy. That is the continuous-trigger theory for activating the insurers' obligation to respond under the policies.
....
Because multiple policies of insurance are triggered under the continuous-trigger theory, it becomes necessary to determine the extent to which each triggered policy shall provide indemnity. "Other insurance" clauses in standard CGL policies were not intended to resolve that question. A fair method of allocation appears to be one that is related to both the time on the risk and the degree of risk assumed.... Estimating the degree of risk assumed is difficult but not impossible. Insurers whose policies are triggered by an injury during a policy period must respond to any claims presented to them and, if they deny full coverage, must initiate proceedings to determine the portion allocable for defense and indemnity costs. For failure to provide coverage, a policyholder may recover costs incurred under the provisions of Rule 4:42-9(a)(6)....

*515 [Owens-Illinois, supra, 138 N.J. at 449-479, 650 A.2d 974 (other citations and footnotes omitted).]
In applying the Court's reasoning in Owens-Illinois, the same argument advanced here by Twin Citythat its multi-year policy provides only a single occurrence limitwas rejected by Judge Brotman in Chemical Leaman Tank Lines v. Aetna Cas. & Sur. Co., 978 F.Supp. 589, 606-08 (D.N.J.1997), aff'd in part, rev'd in part on other grds., 177 F.3d 210 (3rd Cir.1999). The court logically concluded that progressive environmental damage must be treated as a separate occurrence in each of the insurer's triggered policy periods. Id. at 608.
In Carter-Wallace v. Admiral Ins., supra, the Court approved the reasoning contained in Chemical Leaman. 154 N.J. at 327, 712 A.2d 1116. In Carter-Wallace, the Court addressed the issue of "how the responsibility of an excess insurer is measured in the context of environmental damage with a continuous trigger of liability over many years." Id. at 317, 712 A.2d 1116. Carter-Wallace was a manufacturer of pharmaceutical and consumer products. In 1966, it hired a licensed waste hauler to remove and dispose of waste generated at the company's Cranbury plant. The waste was transported to the Lone Pine Landfill in Monmouth County until 1979, when Lone Pine was closed by the New Jersey Department of Environmental Protection (DEP). In 1982, the United States Environmental Protection Agency (EPA) notified Carter-Wallace and other disposers of waste at Lone Pine that they were potentially responsible parties as generators of waste that had contaminated the site. Id. at 318, 712 A.2d 1116.
Carter-Wallace filed a declaratory judgment action seeking defense reimbursement and indemnity from over twenty-four insurers for costs it expended for the cleanup of Lone Pine. All of Carter-Wallace's claims were settled with the exception of that against one of its insurers, Commercial Union Insurance Company, which had issued a second-layer excess policy to Carter-Wallace that was in effect from April 30, 1969 to April 30, 1972. Ibid.
The Commercial Union CGL policy provided $1 million in coverage, which was part of a shared $10 million umbrella coverage in excess of both a primary layer of coverage and a first-level excess layer of coverage. Ibid. Under Commercial Union's policy, the "proportion of risk insured" was:
$1,000,000.00 part of $10,000,000.00 each occurrence and in the aggregate excess of $5,000,000.00 each occurrence and in the aggregate which in turn is in excess of primary insurance.
[Id. at 319, 712 A.2d 1116.]
Tried to a jury, a verdict was rendered in favor of Carter-Wallace. The jury concluded that property damage at Lone Pine occurred during Commercial Union's policy period; that the contamination at Lone Pine was part of a continuous and indivisible process; and that Carter-Wallace neither expected nor intended the environmental damage. Ibid. However, in a bench trial on damages, the trial court found that no part of Carter-Wallace's damages was allocable to Commercial Union, reasoning that Carter-Wallace had not yet exhausted all of the primary and first-layer excess coverage in effect during the seventeen-year "trigger period." Ibid. The court concluded "that the coverage provided by all triggered primary and first-layer excess policies must be exhausted before allocating any share to Commercial Union's second-payer excess policy. Because Carter-Wallace did not fulfill that requirement of `horizontal exhaustion,' the court concluded that Carter-Wallace was *516 not entitled to payment under the Commercial Union policy." Id. at 319-20, 712 A.2d 1116.
In explaining the continuous-trigger theory as applied to environmental damage claims, the Court stated, in pertinent part:
Realizing that the adoption of the continuous trigger theory necessarily meant that multiple insurance policies would bear the responsibility of providing coverage, the question in Owens-Illinois[, Inc. v. United Insurance Co., 138 N.J. 437, 650 A.2d 974 (1994),] then centered on the proper methodology to be used in allocating the appropriate share of that responsibility among each of the triggered policies. We rejected joint-and-several allocation, 138 N.J. at 468, 650 A.2d 974, a theory under which the problem of indivisible injury is resolved simply by collapsing the continuous injury into one year. Joint-and-several allocation effectively allows a policyholder to simply select one triggered year and exhaust the coverage provided during that period in satisfaction of its claim, id. at 459-62, 650 A.2d 974, requiring the insurers to sue each other for contribution. We determined that such an approach rested on an assumption not in accordance with the development of the law: "that at every point in the progression the provable damages due to injury in any one of the years from exposure to manifestation will be substantially the same...." Id. at 468, 650 A.2d 974. We also considered the effect on the allocation issue of "other insurance" clauses, which are provisions typically designed to preclude a double recovery when multiple, concurrent policies provide coverage for a loss. We determined that such clauses were not generally applicable in the continuous-trigger context where successive rather than concurrent policies were at issue. Id. at 470, 650 A.2d 974. In sum, we found the contract language and the traditional rules of interpretation to be unhelpful in settling on the proper method of allocating responsibility. Id. at 468-71, 650 A.2d 974.
Rather, our resolution of the issue was guided by our concern for the efficient use of resources to address the problem of environmental disease and by the demands of simple justice. Id. at 472-73, 650 A.2d 974. We also observed that "[b]ecause insurance companies can spread costs throughout an industry and thus achieve cost efficiency, the law should, at a minimum, not provide disincentives to parties to acquire insurance when available to cover the risks." Ibid. We determined that "any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure," and concluded that the "better formula" was to "allocate[ ] the losses among the carriers on the basis of the extent of the risks assumed, i.e., proration on the basis of policy limits, multiplied by years of coverage." Id. at 475, 650 A.2d 974....
....
Nevertheless, we expressly declined to address how the solution we crafted would affect excess insurers[.] ... At issue in this appeal is how excess insurance is to be considered when allocating responsibility under a continuous trigger of liability.
In discussing, and rejecting, the allocation methods advanced by Carter-Wallace and Commercial Union, the Court stated, in pertinent part:
In Chemical Leaman Tank Lines, Inc. v. Aetna Casualty & Surety Co., 978 F.Supp. 589 (D.N.J.1997), Judge Brotman relied on Owens-Illinois in allocating coverage between various levels of excess insurance. Not unlike this appeal, *517 Chemical Leaman involved a plaintiff that sought coverage for costs incurred as a result of environmental contamination. Id. at 592-93. The insurers argued that each layer of insurance must be exhausted across all of the triggered policy years before the next layer would be allocated, id. at 604, a contention that Commercial Union echoes here. Using the example we provided in Owens-Illinois, the court observed that "[t]he Owens-Illinois method intentionally assigns a greater portion of indemnity costs to years in which greater amounts of insurance were purchased, based on the view that this measure of allocation is more consistent with the economic realities of risk retention and risk transfer." Id. at 605. The court therefore rejected the theory of horizontal exhaustion by layer, and "direct[ed] apportionment of damages among policy years without reference to the layering of policies in the triggered years." Ibid. However, the court did note that within any given year, each layer of excess coverage must be depleted before the next level is pierced. Id. at 606.
In order to allocate fairly the losses among carriers to the extent of the risk assumed by each, we provided an illustration in Owens-Illinois, supra, that assumed a nine-year continuous trigger and broke down the corresponding obligations of the insurers and the owners into three three-year periods. 138 N.J. at 475-76, 650 A.2d 974. Based on the amount of coverage provided in each three-year block, we determined that carriers in the first three years would bear 6/27ths of the burden, carriers in the second three years 9/27ths, and the building owners in the last three years 12/27ths of a loss (a time in which no insurance had been purchased). In Chemical Leaman, the court simply extended that calculation to make the further assessment of the responsibility borne by each year of the continuous trigger. 978 F.Supp. at 605. Returning to our example, carriers in the first year would therefore be responsible for 2/27ths of the loss, carriers in the second year for 2/27ths, and carriers in the third year for 2/27ths. Then, having reached a figure for each year, the Chemical Leaman court adopted a method that vertically allocated each policy in effect for that year, beginning with the primary policy and proceeding upward through each succeeding excess layer. Id. at 606. Assume that primary coverage for one year was $100,000, first-level excess insurance totaled $200,000, and second-level excess coverage was $450,000. If the loss allocated to that specific year was $325,000, the primary insurer would pay $100,000, the first-level excess policy would be responsible for $200,000, and the second-level excess policy would pay $25,000.
We believe Judge Brotman's well-reasoned opinion in Chemical Leaman represents a natural extension of Owens-Illinois, one that is entirely consistent with our belief that "any allocation should be in proportion to the degree of the risks transferred or retained during the years of exposure." Owens-Illinois, supra, 138 N.J. at 475, 650 A.2d 974. In Owens-Illinois we identified several public interest factors relevant to the appropriate method of allocating insurance coverage, including the efficient use of available resources, the interests of simple justice, and the need for an "efficient response" to the logistical challenge posed by environmental insurance litigation. Id. at 472-74, 650 A.2d 974.
We are confident that the Chemical Leaman solution best serves those interests. Firstly, this approach makes efficient *518 use of available resources because it neither minimizes nor maximizes the liability of either primary or excess insurance, thereby promoting cost efficiency by spreading costs. See Owens-Illinois, supra, 138 N.J. at 472-73, 650 A.2d 974. That method also promotes "simple justice," id. at 473, 650 A.2d 974, by respecting the distinction between primary and excess insurance while not permitting excess insurers unfairly to avoid coverage in long-term, continuous-trigger cases. Additionally, adoption of that allocation method will introduce a degree of certainty and predictability into the complex world of environmental insurance litigation in continuous-trigger cases. Moreover, we perceive that that solution is consistent with the contract language, as Commercial Union's second-level excess policy will not be pierced unless and until the primary and first-level excess policies in effect for a given year have been expended.
Our jurisprudence in this area has not been marked by rigid mathematical formulas, and we do not advocate any such inflexibility now. Rather, our focus remains on "[a] fair method of allocation... that is related to both the time on the risk and the degree of risk assumed." Id. at 479, 650 A.2d 974. Nevertheless, we anticipate that the principles of Owens-Illinois, as clarified by our decision today, represent the presumptive rule for resolving the allocation issue among primary and excess insurers in continuous trigger liability cases unless exceptional circumstances dictate application of a different standard....

[Id. at 325-28, 712 A.2d 1116 (other citations omitted).]
Accordingly, it is clear that underpinning the Court's allocation method is acceptance of the proposition that losses in an environmental damages case must be treated as an occurrence in each of the periods covered by a comprehensive general liability policy.
III
Turning to Twin City's argument that the two-week extension of its policy did not create an additional aggregate limit of liability, we have carefully reviewed the record in the light of the written and oral arguments presented by the parties, and now affirm substantially based upon the reasoning articulated by Judge Hamlin in his oral opinion on the Puritan policy issue delivered on July 2, 1996 and for the reasons expressed in his written opinion on the Twin City policy issue dated December 2, 1996. We add the following.
Other courts analyzing the issue of whether issuance of a short-term policy creates a new set of aggregate policy limits have reached the same conclusion. We find their reasoning to be persuasive and worthy of extensive discussion.
In Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp., 73 F.3d 1178 (2d Cir.1995), the court was presented
numerous issues concerning liability insurance coverage in the context of claims for personal injury and property damage arising from exposure to asbestos. The principal issue is to determine the relevant time period or periods for which liability insurance coverage is available to a former asbestos product manufacturer confronted with thousands of asbestos-related claims, where the policies at issue are triggered not by the assertion of a claim against the insured but by the occurrence of bodily injury or property damage during the policy period.
[Id. at 1186.]
National Gypsum Company (NGC) was formed in Buffalo, New York in 1925 and *519 became a leading manufacturer of gypsum wallboard and other building materials. From 1930 to 1981, NGC manufactured products that contained asbestos. From 1972 until the date of the Stonewall decision, NGC was sued by approximately 100,000 claimants seeking damages for bodily injury allegedly resulting from exposure to and inhalation of asbestos fibers contained in products manufactured by NGC. Id. at 1187.
The Stonewall action involved all primary and excess liability insurance policies issued through 1985 to NGC for asbestos-induced bodily injury and property damage claims. In 1985, NGC's insurers placed asbestos exclusions into NGC's policies. Ibid.
Under the terms of the policies at issue, the Insurers agreed to indemnify for "all sums" that NGC became legally obligated to pay as damages as a result of bodily injury or property damage caused by an "occurrence." Although the definitions vary slightly, a common definition of "occurrence" in the policies is "an accident, or a continuous or repeated exposure to conditions which results, during the policy period, in personal injury, property damage ... neither expected nor intended from the standpoint of the insured."

[Stonewall, supra, 73 F.3d at 1187.]
One of the issues presented to the Stonewall court for resolution was the amount of aggregate limits available to NGC on excess policies. Id. at 1186. The appeal to the Second Circuit was from several rulings of the district court, including the following:
On July 22, 1992, the District Court issued another Memorandum Opinion and Order concerning certain insurance policies that were issued to NGC for partial years-policies that were either canceled prior to the expiration of the policy period or extended for a period of several months. The District Court generally concluded that the policies' full aggregate limits of liability apply for any period less than one year. However, the District Court made an exception for two excess insurers on the ground that, in canceling and then renewing the policy, the parties had intended merely to increase the aggregate limit available under the old policy, rather than to create an additional aggregate policy limit.
[Id. at 1190.]
The Stonewall court considered the aggregate policy limit issue concerning short-term policies in several different factual contexts. The issue concerning the Stonewall policy was described, as follows:
For an advanced premium of $171,680, Stonewall issued an excess umbrella policy to NGC, effective April 25, 1978, to July 1, 1979, with occurrence and aggregate limits of $5 million. The Stonewall policy states that its liability limits of $5 million are available "in the aggregate for each annual period during the currency of this policy." The term "annual period" is not defined anywhere in the Stonewall policy, nor does the cancellation section contain any provision stating the consequences of a fractional period upon aggregate limits. The Stonewall policy was canceled "pro rate" effective January 1, 1979, and $71,920 of the premium was refunded to NGC. NGC then purchased a second excess umbrella policy from Stonewall, effective January 1, 1979, to January 1, 1980, for a premium of $155,000. Like the first Stonewall policy, the second Stonewall policy had occurrence and aggregate limits of $5 million.
[Id. at 1216.]
*520 The district court ruled that Stonewall's short-term policy of approximately eight and one-half months, from April 25, 1978 to January 1, 1979, contained coverage for the full aggregate limit of $5 million. In affirming that determination, the court stated, in pertinent part:
Nothing in the language of Stonewall's policies provides for proration of annual aggregate limits where the policy is in effect for only a fraction of a year. Stonewall's policies are silent on the consequences of cancellation, making this another ambiguity to be resolved against the insurer.... Moreover, in exchange for a reduction in premiums, Stonewall received a reduction in the amount of time on the risk.
[Id. at 1216-17 (citations omitted).]
In discussing application of the district court's ruling to an excess policy issued to NGC by Republic Insurance Company, the court provided the following factual context:
With respect to Republic's policy, Republic originally issued an excess umbrella policy to NGC covering the period January 1, 1977, to January 1, 1978. The Republic policy states that its limits of $5 million are available "in the aggregate for each annual period during the currency of this policy." As in the Stonewall policies, the term "annual period" is not defined in the Republic policy, nor does the Republic policy contain any provision stating the consequences of a fractional annual period upon the policy's aggregate limits. The advance premium paid by NGC for the policy was $129,032. In consideration of an additional premium of $53,004, coverage under the policy was extended to April 25, 1978.
[Id. at 1217.]
The District Court held that Republic's short-term policy of approximately four months provided another $5 million in aggregate coverage. Republic argued that the annual period of its policy was simply extended for a four-month period without creating a second full annual aggregate limit. In rejecting this argument, the Second Circuit stated:
However, in light of both the ambiguity in the policy language and the premium amount paid by NGC, which was roughly equivalent to one third of a year of full coverage, it was reasonable for the District Court to conclude that NGC intended to purchase an additional policy with the full $5 million limit applicable for that four-month period.

[Id. at 1217.]
However, the district court ruled annual aggregate policy limits were not created on short-term policies where there was either a total change in the insurance carrier or a change in the level at which the insurer became liable. In reviewing that determination, the Second Circuit outlined the facts, as follows:
[A] Home policy was issued to NGC effective January 1, 1965 to January 1, 1968, with an annual aggregate limit of $2 million in excess of primary coverage. NGC paid a premium of $26,326 for this three-year policy. Effective October 4, 1967, this policy was canceled and replaced with another Home policy, which was effective October 4, 1967, to January 1, 1971, with limits of $5 million in excess of primary coverage. As consideration for these higher limits, NGC paid a larger premium of $32,330.22 for the three-year-and-three-month replacement policy.
At this same time, [Commercial Union (CU)] also issued a policy to NGC for $3 million of additional excess coverage. For this three-year policy, which was effective for the same period as that of *521 the first Home policy (January 1, 1965 to January 1, 1968), NGC paid a premium of $4,970. Like the first Home policy, the first CU policy was canceled effective October 4, 1967, and replaced with a new CU policy, effective October 4, 1967, to January 1, 1971, with limits of $5 million in excess of primary coverage. As consideration for these higher limits, NGC paid a larger premium for the three-and-three-month replacement policy. The CU policy states that it is "subject to all the terms and conditions of policies ... issued by [Home]."
The Home policy states that the aggregate limits apply "for each annual period where applicable." In turn, the term "annual period" is defined for each policy as "each consecutive period of one year commencing from the inception date of this Policy." Like the other policies, nothing in the Home policy's cancellation clause provides for any decrease in aggregate limits as a consequence of cancellation prior to the end of a period. Nevertheless, the District Court concluded that NGC had canceled and replaced the Home policy simply to increase the amount of its excess coverage from $2 million to $5 million rather than to obtain a $7 million limit for the replacement period.

[Id. at 1217.]
In affirming the determination of the district court, the Second Circuit stated, in pertinent part:
We do not regard the District Court's assessment of the circumstances of the transaction between NGC and Home and of the parties' intent to be erroneous.
NGC also contests the District Court's decision to extend to CU the ruling with respect to Home. Notwithstanding the fact that CU's policy was an upper-level excess policy while Home's policy was a lower-level umbrella policy, the District Court's determination regarding CU was proper. Home and CU used the same form and, as with the Home policy, the amount of NGC's excess coverage increased under the CU replacement policy, suggesting that NGC was merely increasing the amount of excess coverage available for the replacement period from $3 million to $5 million, rather than adding $5 million to the $3 million limit already in place.

[Id. at 1217-18.]
Accordingly, the pivotal factors relied upon by the Stonewall court in the calculus to determine whether full aggregate limits of excess liability coverage exist for policy periods covering a fractional period of one year, created either by cancellation before the stated policy period had expired or by extension of the policy for a period beyond the stated expiration date, were whether there is a provision in the policy for reduction or proration of annual aggregate limits in the event of cancellation; whether the policy provides for proration of annual aggregate limits where the policy is in effect for only a fraction of the year; whether the policy addresses the issue of cancellation; whether the change in policy involves either a change in the insurance carrier, a change in the excess coverage limits or a change in the level at which the carrier became liable; and whether the percentage relationship of the premium paid for the short-term policy is roughly equivalent to the percentage of the year covered. The analysis must be completed in the light of policy construction law that policy ambiguities should be construed in favor of the policy-holder. Id. at 1216-17.
In Board of Trs. of Univ. of Ill. v. Insurance Corp. of Ireland, Ltd., 750 F.Supp. 1375 (N.D.Ill.1990), aff'd, 969 F.2d 329 (7th Cir.1992), the Board of Trustees of the University of Illinois (Board) instituted *522 suit against its insurer, Insurance Corporation of Ireland, Ltd. (Ireland), seeking a declaratory judgment as to the aggregate policy limits of two policy periods. Id. at 1376.
On July 17, 1984, Ireland issued the Board an excess public, hospital and medical professional liability insurance policy covering the three-year period from March 1, 1984 to March 1, 1987. In its "Limit of Liability" section the policy provided a $5 million combined single limit for "each and every occurrence and in the aggregate[,]" and "[e]xcess of a Self Insured Retention of $100,000 each and every occurrence $1,000,000 overall annual aggregate." Ibid.
At the request of the Board, Ireland agreed to change the premium payment dates to coincide with the Board's fiscal year by issuance of an insurance policy to cover the four periods from March 1, 1984 to July 1, 1984; July 1, 1984 to July 1, 1985; July 1, 1986 to July 1, 1986; and July 1, 1986 to July 1, 1987. Ireland issued an endorsement, amending the policy period to read, from March 1, 1984 to July 1, 1987. Id. at 1377. The endorsement "went on to say that `All other terms and conditions [of the original Policy] remain unchanged.'" Ibid. The premium for the four-month period was $165,000, and the premiums for each of the one-year periods was $495,000. Ibid.
There was an "occurrence" during the policy's initial four-month short-term, or "stub period" (March 1, 1984 to July 1, 1984) that triggered the Board's potential liability above its retention obligation. Ibid. Ireland canceled the policy effective July 1, 1985, leaving only a sixteen-month effective coverage period, from March 1, 1984 to July 1, 1985.
The Board contended that the endorsement issued by Ireland created an initial four-month policy period with a separate aggregate limit of $5 million, followed by three annual periods, each having its own separate annual aggregate of $5 million in coverage. Ibid. Ireland argued that the policy was extended four months so as to expire on July 1, 1987 to coincide with the beginning of the Board's fiscal year, and that the $5 million aggregate coverage is all the Board had for the entire policy period of forty months. Ibid. The issues focused on the mutual intent of the parties.
After concluding that the intent of the Board and Ireland was that the policy contain "annual" aggregate policy limits of $5 million, and so reforming the insurance contract, the court then addressed the effect of the addition of four months to the policy term. Id. at 1382-83. The Board argued
that it paid the $165,000 for $5 million in coverage for four months, obviously on the premise that the insurer's risk of encountering $5 million in claims in four months is one-third of the risk in doing so in 12 months.

[Id. at 1383.]
The court agreed with the Board's position, focusing on the amount of the premium charged for the four-month period as the pivotal factor in reaching that conclusion. The court explained, as follows:
To see why that is so, we may examine the kind of premium that an insurer would be expected to charge under alternative scenarios, assuming in each instance a liability insurance policy for which the total risks were such that a $5 million in total ("aggregate") coverage for a year would call for a $495,000 premium:
1. What premium would the insurer charge for a policy that carried the same $5 million of total risk, but over a two-year rather than a one-year coverage period? Although the answer *523 to that question cannot be quantified precisely without knowing more about the various factors that enter into the setting of premiums, it is morally certain that the total premium would be more than $495,000 (because the insurer's period during which it is at risk has just been increased) but something less than $990,000 (because the amount of the insurer's risk has not precisely doubled-even though the period of coverage has doubled, the nature of the policy as one that provides diminishing coverage, plus the fact that the total dollar exposure has remained constant, negates an outright doubling of the risk).
2. What premium would the insurer charge for a policy that carried $5 million of risk for each of two yearly periods, looked at separately? Here the answer is easy$990,000 (for each year carries the same $495,000 premium for the same $5 million of total risk for a like period).
And why is that second proposition true? Purely and simply, it is because the statistical likelihood of encountering any particular claim is a direct function of time: It is twice as likely that a claim will be made against an insured in either one of two years as it is that the same claim will be encountered in one year.
To move in the other direction, it is one-third as likely that a claim will be made against an insured in four months as it is that the same claim will be encountered in one year. Thus when [the Board] paid another $165,000 for the tacking on of a four-month period at the beginning of the Policy, that had to be for the obtaining of $5 million in coverage for that stub period. In this instance it makes no difference that the parties did not talk about the coverage issuethe result flows from the one item of totally objective evidence, the premium itself.
[Id. at 1383-84 (footnote omitted).]
Here, Twin City charged USM $152 for the two-week period. The percentage relationship of that premium to the original policy premium of $5,040 is roughly equivalent to the percentage relationship of the two-week period to the original policy period. As in Board of Trs. of Univ. of Ill., Twin City's risk of encountering $10 million in claims in two weeks was 1/26th of the risk of doing so in 52 weeks. This result flows from the objective evidencethe premium itself.
In Unigard Sec. Ins. Co., Inc. v. North River Ins. Co., 762 F.Supp. 566 (S.D.N.Y.1991), aff'd in part, rev'd on other grds, 4 F.3d 1049 (2d Cir.1993), the court considered the obligation of a reinsurer for defense costs and coverage for a stub period of the policy. Unigard Security Insurance Company (Unigard) issued a facultative reinsurance certificate to North River Insurance Company (North River). Unigard instituted suit seeking a declaratory judgment relieving it of any obligation to indemnify North River for losses paid by North River to its insured Owens Corning Fiberglass Corporation (Owens-Corning) as a result of mass tort asbestos litigation. North River counterclaimed, seeking indemnification. Id. at 570.
In July 1974, North River issued two excess liability insurance policies to Owens Corning; one was a second-layer excess policy, and the other a third-layer excess policy. Unigard reinsured the third-layer excess policy. There were three policy periods of the third-layer excess policy, as follows: (1) July 9, 1974 to October 22, 1974; (2) October 22, 1974 to October 22, 1975; and (3) October 22, 1975 to October 22, 1976. During the first two periods, the policy provided excess liability insurance coverage in the amount of $30 million, as *524 part of a $50 million coverage layer in excess of $75 million in underlying primary insurance coverage for Owens Corning's losses. During the third period, the policy provided $25 million in excess coverage with similar underlying limits. Id. at 571.
The certificate of facultative reinsurance issued by Unigard to North River provided reinsurance coverage to North River in the principal amount of "$5,000,000 each occurrence and in the aggregate part of" the $30 million coverage under North River's third-layer excess policy for the first two policy periods. Id. at 572.
One of the numerous coverage issues before the court was Unigard's claim that because the initial policy period of the third-layer excess policy was only three and one-half months long (July 9, 1974 to October 22, 1974), rather than a full year, the aggregate policy limit for the third-layer excess policy, and thus the corresponding limit on the reinsurance certificate, must be prorated. Id. at 595. In discussing, and rejecting, that contention, the court stated, in pertinent part:
Unigard bases this argument on language in the underlying insurance policies which stated that the aggregate limits were "for each annual period where applicable." However, there was no provision in the policy which suggested how an aggregate limit was to be treated where the policy period was less than a full year. Based on the testimony of Unigard's own expert, the custom and practice of the insurance industry, and common sense the proration argument must be rejected.
....
Even if Owens-Corning's asbestos losses did not constitute a single occurrence, logic would dictate that the full limit must be available during the shortened stub period, because it would not make sense for the aggregate limit to be less than the occurrence limit. The purpose of having an aggregate limit in addition to an occurrence limit is to cap the indemnity payments made in a given policy period regardless of the number of occurrences. Because the aggregate limit thus protects against repeated occurrences, the aggregate limit could never be less than the single occurrence limit. Unigard's expert conceded this principle. Therefore, as both the aggregate and occurrence limits for [the third-layer excess stub policy] are $30 million, there can be no proration of the aggregate limit during that period.
Although not necessarily controlling, Judge Brown's decision on the proration issue in the coordinated [Asbestos Ins. Coverage Cases, No. 1072, Sup.Ct., County of San Francisco, Dep't No. 9, Statement of Decision Concerning Phase IV Issues Jan. 24, 1990, at 6-7 (citation omitted)], is also informative:
Since proration of annual aggregate limits would reduce coverage, the burden of proof is on the insurers to show that the limits should be prorated. However, the result would be the same even if the burden of proof were on the policyholders.
Nothing in the plain language of the policies provides for proration of annual aggregate limits where the policy is in effect for a fraction of a year. The policy language describes the consequences of cancellation; it reduces the period of coverage and reduces the premium paid by the policyholder. There is no provision for the reduction of aggregate limits in the event of cancellation. The insurers could have stated plainly that aggregate limits are prorated in the event of cancellation, but failed to do so.
....
The insurers have asserted that it would be unfair or inequitable for the policyholders to receive full aggregate *525 limits while only paying premiums for a fraction of a year. However, both the insurers and the policyholders received the benefit of their bargain. In exchange for a reduction in premiums, the insurers received an equivalent reduction in the amount of time the insurer was on the risk.
As Judge Brown concludes, the premium is prorated but this proration reflects the shortened length of time for which the insurer is exposed to the risk of loss, not a reduced quantum of protection available if the risk materializes in the stub period, however short it may be.
[Unigard, supra, 762 F.Supp. at 595-96.]
See also In re Liquidation of Midland Ins. Co., 269 A.D.2d 50, 709 N.Y.S.2d 24, 35 (App.Div.2000).
Here, the Twin City policy is at least ambiguous on the issue of whether a separate aggregate policy coverage limit is applicable to the two-week policy extension period. The language in Endorsement No. 12 that all other terms and conditions of the policy shall remain the same is susceptible to differing interpretations. Given the ambiguity, the expectation of USM that payment of the prorated premium reflected only Twin City's reduced time on the risk, and not a reduction of the policy's aggregate limits, was reasonable. The amount of the prorated premium charged for the additional two-week period objectively suggests there was no reduction in the policy's aggregate coverage limits, but rather reflects Twin City's reduced time on the risk. Moreover, this interpretation is consistent with the fact that the initial three-month term (August 1, 1983 to November 11, 1983) was considered an "annual aggregate term."
Under Twin City's interpretation, USM was purchasing coverage for the two-week period that excluded a significant material component of the policy's coverage components-the $10 million aggregate coverage. If Twin City desired to limit its coverage during the additional two-week period, insurance policy interpretation principles required that it be specifically so stated in the endorsement extending the coverage. Nothing in the language of the Twin City policy provides for proration of annual aggregate limits where the policy is in effect for only a fraction of a year. The benefit to Twin City was the reduced period of time on the risk. That Twin City now documents that the intent of its underwriters was not to create an additional aggregate policy limit for the two-week period is of no moment; it is the language of the policy and its endorsements, and the ambiguity created, that controls the interpretation.
Affirmed.